VIVIEN KELLEMS ET AL. *v.* F. GEORGE BROWN, TAX COMMISSIONER, ET AL.

HOUSE, C. J., RYAN, SHAPIRO, LOISELLE and MACDONALD, Js.

480

Argued June 15—decided July 27, 1972

*John S. Murtha,* with whom were *John E. Silliman* and *Willard F. Pinney, Jr.,* and, on the brief, *J. Read Murphy,* for the plaintiffs.

*Ralph G. Murphy,* assistant attorney general, with whom were *John M. Dunham* and *Richard K. Greenberg,* assistant attorneys general, and, on the brief, *Robert K. Killian,* attorney general, for the defendants.

*Dorrance Sexton, Jr.,* filed a brief as amicus curiae but did not argue the cause.

HOUSE, C. J. This case started out as an action for a declaratory judgment and for ancillary relief by way of an injunction. The action was obviously designed primarily to seek a determination of the constitutionality of chapter 224 of the General Statutes, commonly known as the Capital Gains and Dividends Tax. This chapter was enacted as Public Act No. 8 of the June, 1971, special session of the General Assembly. The procedure finally followed by the parties, however, deviated from the usual practice of a direct stipulation as to the operative facts with a prayer for relief stating "with precision the declaratory judgment desired." Practice Book § 310 (b). Instead, following the practice customar-

ily followed in will construction suits, the parties stipulated for a reservation of the case to this court on an agreed statement of facts, propounding twenty questions on which the advice of the court was sought. See Practice Book §§ 738, 739, Form 614, p. 759. Two questions (Nos. 2 and 4) were not pursued in this court and one (No. 5) has become moot. The remaining questions are set out in the footnote.[1]

[1] "1. Do the provisions of Chapter 224 imposing a tax on dividends received by individual residents of the State of Connecticut and leaving untaxed other items of unearned income received by said individuals violate the equal protection provisions of (a) Article First, Section 20 of the Connecticut Constitution? (b) Section 1 of the 14th Amendment to the United States Constitution (hereinafter 14th Amendment)?

. . . . .

"3. Do the provisions of Section 12-506 (c) (3) which grant an exemption to any person who is unmarried and a widow on the last day of her taxable year, which is two and one-half times greater than the same exemption granted to a person who is not such a widow, violate the equal protection provisions of (a) Article First, Section 1 of the Connecticut Constitution? (b) Article First, Section 20 of the Connecticut Constitution? (c) Section 1 of the 14th Amendment?

. . . . .

"6. Are any of the Sections of Chapter 224 void for vagueness under the due process clause of (a) Article First, Section 8 of the Connecticut Constitution? (b) Section 1 of the 14th Amendment?

"7. As to each of the following sections of the Chapter is there an unlawful delegation of legislative power to an administrative official in violation of Article First, Section 8, Article Second and Article Third, Section 1 of the Connecticut Constitution (a) Section 12-508? (b) Section 12-510? (c) Section 12-516? (d) Section 12-517? (e) Section 12-518?

"8. As to each of the following sections of the Chapter is there an unlawful delegation of legislative power from the Connecticut General Assembly to the Congress of the United States in violation of any of Article First, Section 8, Article Second, and Article Third, Section 1 of the Connecticut Constitution (a) Section 12-505? (b) Section 12-506? (c) Section 12-506a?

"9. As to each of the following sections of the Chapter is there an unlawful delegation of legislative power from the Connecticut

Perhaps because of this unorthodox procedure many of the questions reserved for the advice of this court lack the precision and specificity which is not only desirable but also mandatory in a declara-

General Assembly to the Congress of the United States in violation of the 10th Amendment to the United States Constitution (a) Section 12-505? (b) Section 12-506? (c) Section 12-506a?

"10. Does Section 12-505 of the Chapter define 'net gains' in such a manner as to interfere retroactively and unlawfully with vested rights in violation of the due process provisions of (a) Article First, Section 8 of the Connecticut Constitution? (b) Section 1 of the 14th Amendment?

"11. Do Sections 12-521 and 12-522, read in conjunction with Section 12-515, provide an adequate procedural relief in compliance with the due process provisions of (a) Article First, Section 8 of the Connecticut Constitution? (b) Section 1 of said 14th Amendment?

"12. Is the plaintiff Kellems obligated by law to pay the tax imposed by Chapter 224 upon dividends as defined by Section 12-505 which she has received during calendar year 1971?

"13. Is the plaintiff Miller obligated by law to pay the tax imposed by Chapter 224 upon dividends, as defined by Section 12-505, which dividends he has received during calendar year 1971?

"14. Is the plaintiff Marsh obligated by law to pay the tax imposed by Chapter 224 upon his gains from the sale of capital assets as defined by Section 12-505, which gains he has realized during calendar year 1971?

"15. If the answer to the preceding question is 'Yes,' is the plaintiff Marsh entitled to compute such gains within the meaning of Sections 12-505 and 12-506 using as his basis the value of his securities (a) on December 31, 1970? (b) on August 15, 1971?

"16. If neither of the dates in question 15 is applicable, must the plaintiff Marsh compute such gains within the meaning of Sections 12-505 and 12-506 using as his basis the value of his securities on the date of his acquisition, February 28, 1968?

"17. If the answer to question 14 is 'Yes,' must the plaintiff Marsh compute such tax at 6% of 100% of his net capital gains realized by him during calendar year 1971?

"18. If the answer to question 17 is 'No,' does the plaintiff Marsh compute such tax at 6% of 50% of such net capital gains?

"19. Is the plaintiff Marsh entitled to an exemption under the provisions of Section 12-506 (c) (1) which is more than $2000?

"20. If the answer to question 13 is 'Yes,' may the plaintiff Miller deduct from his dividend income his capital losses realized in 1971?"

tory judgment action. Practice Book § 310 (b). See *Plunkett* v. *Nationwide Mutual Ins. Co.,* 150 Conn. 203, 211, 187 A.2d 754; *Holt* v. *Wissinger,* 145 Conn. 106, 109, 139 A.2d 353; *Kievman* v. *Grevers,* 122 Conn. 406, 412, 189 A. 609. More particularly, many of the questions reserved are not limited to the situation of the particular plaintiffs as disclosed in the stipulation of facts or to the impact of the statutory provisions on any right of these plaintiffs as distinguished from the rights of any person not a party to this action. "[A] plaintiff, in challenging the constitutionality of a statute, must sustain the burden of proving that the effect or impact of the challenged statute on him adversely affects a constitutionally protected right which he has. 'This means a right which he proves that he has under the facts of his particular case and not merely under some possible or hypothetical set of facts not proven to exist.' *Hardware Mutual Casualty Co.* v. *Premo,* . . . [153 Conn. 465, 471, 217 A.2d 698]." *Adams* v. *Rubinow,* 157 Conn. 150, 152, 251 A.2d 49; *Riley* v. *Liquor Control Commission,* 153 Conn. 242, 215 A.2d 402; *Karen* v. *East Haddam,* 146 Conn. 720, 727, 155 A.2d 921. A number of the plaintiffs' questions are not susceptible of the dogmatic and categorical answers which the plaintiffs seek. Under the circumstances, it is only because of the importance of the issues involved and the great public interest in them that we undertake, so far as is reasonably possible, to include in our discussion answers to some of the broad questions propounded. We do so with the express caveat that such answers are applicable only within the limited context of the specific facts covered by the stipulation agreed on by the parties to this action.

Chapter 224, to which we will hereafter refer as

the act, is too long to be incorporated in this opinion and may be found in the 1971 Public Acts and General Statutes §§ 12-505—12-522. In essence, the act levies an income tax on dividends received and capital gains realized by residents of Connecticut.[2] It is unnecessary to summarize in any detail the facts as stipulated by the parties. It suffices to note that the defendant F. George Brown is the state tax commissioner, that the plaintiffs Vivien Kellems, Carl E. Miller and Bryan H. Marsh are all residents of Connecticut, that during 1971 Kellems and Miller received dividends as that term is defined in the federal Internal Revenue Code, and that during 1971 Marsh received net gains from the sale or exchange of capital assets as those terms are defined in chapter 224.

As briefed by the parties, the case reserved for the advice of this court involves five principal issues, four of them involving the constitutionality of the act and the fifth primarily questions of statutory construction. The plaintiffs claim that (1) chapter 224 violates the equal protection provisions of the state and federal constitutions in singling out for taxation dividends received by individuals while not taxing interest income and other types of investment income; that (2) the act is so badly drafted as to be void for vagueness under the due process clauses of the state and federal constitutions; that (3) the act unlawfully delegates legislative powers to the state tax commissioner and the federal government in violation of applicable constitutional principles; that (4) if the basis for measuring capital gains is

---

[2] For a general discussion of the 1971 act, see Lester B. Snyder, "Tax Policy in the 1971 Connecticut General Assembly," 46 Conn. B.J. 136 (1972) and Frank S. Berall, "Connecticut's Investment Income Tax," id., p. 185.

not limited to the increase in value subsequent to December 31, 1970, then the capital gains tax violates the due process provisions of the state and federal constitutions; and that (5) even if the act is otherwise valid, a proper construction of its provisions requires that the taxpayer be permitted a deduction of 50 percent of his net long term capital gains less net short term capital losses.

## I

(a) We consider first the contention of the plaintiffs that the act is unconstitutional because it establishes arbitrary and unreasonable classifications in the designation of the subject of the tax and in the added exemption allowed to "any person who is unmarried and a widow on the last day of her taxable year." § 12-506 (c) (3). It is the plaintiffs' claim that the classifications designated by the act violate the equal protection clauses of the fourteenth amendment to the constitution of the United States, § 1, and the constitution of Connecticut, article first, § 20. The Connecticut constitutional provision has "a like meaning to that in the fourteenth amendment to the constitution of the United States which prohibits the states from denying to any person the equal protection of the laws." *Lyman* v. *Adorno,* 133 Conn. 511, 515, 52 A.2d 702; *State ex rel. Brush* v. *Sixth Taxing District,* 104 Conn. 192, 195, 132 A. 561. The plaintiffs assert that these constitutional provisions are violated by the imposition of the tax on investment income derived from dividends and capital gains while investment income in the form of interest and rents is not subject to the tax. Similarly, they contest the constitutional validity of the provision of the act which grants to "any person who is unmarried and a widow" a tax exemp-

tion which is two and one-half times greater than the exemption granted to other taxpayers including widowers, divorced women and women who have never married.

It is well settled that a plaintiff who attacks a statute on constitutional grounds has no easy burden. As this court said in *Adams* v. *Rubinow,* 157 Conn. 150, 152–53, 251 A.2d 49: "Because of the separation of powers, one claiming that a legislative enactment is invalid on the ground that it is unconstitutional must establish its invalidity on that ground beyond a reasonable doubt. *Hardware Mutual Casualty Co.* v. *Premo,* 153 Conn. 465, 470, 217 A.2d 698. . . . [W]here a statute reasonably admits of two constructions, one valid and the other invalid on the ground of unconstitutionality, courts should adopt the construction which will uphold the statute even though that construction may not be the obvious one. *Carilli* v. *Pension Commission,* 154 Conn. 1, 8, 220 A.2d 439; *Ferguson* v. *Stamford,* 60 Conn. 432, 447, 22 A. 782; *Wilton* v. *Weston,* 48 Conn. 325, 338. Of course, the fact that the plaintiffs chose to request a declaratory judgment, upon a stipulation of facts, in nowise changes or relieves them of the burden of proof resting on them. *Hardware Mutual Casualty Co.* v. *Premo,* supra, 472, 473." To like effect we said in *Edwards* v. *Hartford,* 145 Conn. 141, 145, 139 A.2d 599: "Courts in passing upon the validity of a legislative act do not feel justified in declaring it void unless there is a clear and unequivocal breach of the constitution . . . . We approach the question with great caution, examine it with infinite care, make every presumption and intendment in favor of validity, and sustain the act unless its invalidity is, in our judgment, beyond a reasonable doubt."

In Connecticut, the power to levy taxes is vested in the General Assembly. *Beach* v. *Bradstreet,* 85 Conn. 344, 348, 82 A. 1030. Unlike the federal constitutional limitation which existed prior to adoption of the sixteenth amendment, it appears that this state's power of taxation has never been constitutionally limited except by the constitutional requirements of equal protection and due process. See *Montgomery* v. *Branford,* 107 Conn. 697, 707–8, 142 A. 574. In selecting the subjects of taxation, legislatures have been allowed broad discretion. "The latitude of discretion is notably wide in the classification of property for the purposes of taxation and granting of partial or total exemptions upon grounds of policy." *Royster Guano Co.* v. *Virginia,* 253 U.S. 412, 415, 40 S. Ct. 560, 64 L. Ed. 989. As the United States Supreme Court observed in *Madden* v. *Kentucky,* 309 U.S. 83, 87–88, 60 S. Ct. 406, 84 L. Ed. 590: "The broad discretion as to classification possessed by a legislature in the field of taxation has long been recognized. This Court fifty years ago concluded that 'the Fourteenth Amendment was not intended to compel the State to adopt an iron rule of equal taxation,' and the passage of time has only served to underscore the wisdom of that recognition of the large area of discretion which is needed by a legislature in formulating sound tax policies. Traditionally classification has been a device for fitting tax programs to local needs and usages in order to achieve an equitable distribution of the tax burden. It has, because of this, been pointed out that in taxation, even more than in other fields, legislatures possess the greatest freedom in classification. Since the members of a legislature necessarily enjoy a familiarity with local conditions which this Court cannot have, the presumption of constitutionality

can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes. The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it."

In *State* v. *Murphy,* 90 Conn. 662, 666, 98 A. 343, this court similarly stated: "The taxing power is an inherent attribute of sovereignty and as such unlimited in character and scope save as limitations may be self-imposed. Under our form of government its exercise is vested in the legislative department which may exercise it for lawful purposes in its discretion both as regards the choice of the subject-matter of taxation and the extent and manner of the tax, save as constitutional limitations may intervene, and in the case of the States save also as the property and agencies of the national government within their borders are not within the reach of their sovereignty. *M'Culloch* v. *Maryland,* 17 U.S. (4 Wheat.) 316, 428; *Nathan* v. *Louisiana,* 49 U.S. (8 How.) 73, 82; *Ward* v. *Maryland,* 79 U.S. (12 Wall.) 418, 426; *North Missouri R. Co.* v. *Maguire,* 87 U.S. (20 Wall.) 46, 62. In the choice of subject-matter there is no restriction, not constitutional, short of one imposed by lack of jurisdiction. 'Whether it be person or property, or possession, franchise or privilege, or occupation or right,' the legislative power extends to it. 'It reaches to every trade or occupation; to every object of industry, use, or enjoyment,' in fact to every subject over which the sovereignty of the State extends, and is co-extensive with that sovereignty. 1 Cooley on Taxation (3d Ed.) 9; Cooley's Constitutional Limitations (7th Ed.) 678; *M'Culloch* v. *Maryland,* 17 U.S. (4 Wheat.) 316, 429; *Providence Bank* v. *Billings,* 29 U.S. (4 Pet.) 514, 563; *Ward*

v. *Maryland,* 79 U.S. (12 Wall.) 418, 426; *North Missouri R. Co.* v. *Maguire,* 87 U.S. (20 Wall.) 46, 62."

More recently, in *Allied Stores of Ohio, Inc.* v. *Bowers,* 358 U.S. 522, 526, 527, 79 S. Ct. 437, 3 L. Ed. 2d 480, the United States Supreme Court thus stated the guiding principles: "Of course, the States, in the exercise of their taxing power, are subject to the requirements of the Equal Protection Clause of the Fourteenth Amendment. But that clause imposes no iron clad rule of equality, prohibiting the flexibility and variety that are appropriate to reasonable schemes of state taxation. . . . 'To hold otherwise would be to subject the essential taxing power of the State to an intolerable supervision, hostile to the basic principles of our Government and wholly beyond the protection which the general clause of the Fourteenth Amendment was intended to assure. *Ohio Oil Co.* v. *Conway,* . . . [281 U.S. 146, 159, 50 S. Ct. 310, 74 L. Ed. 775] . . . . 'If the selection or classification is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy, there is no denial of the equal protection of the law. *Brown-Forman Co.* v. *Kentucky,* 217 U.S. 563, 573 [30 S. Ct. 578, 54 L. Ed. 883]' . . . it has long been settled that a classification, though discriminatory, is not arbitrary nor violative of the Equal Protection Clause of the Fourteenth Amendment if any state of facts reasonably can be conceived that would sustain it. *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U.S. 61, 78 [31 S. Ct. 337, 55 L. Ed. 369]; *Quong Wing* v. *Kirkendall,* 223 U.S. 59 [32 S. Ct. 192, 56 L. Ed. 350]; *Rast* v. *Van Deman & Lewis Co.,* 240 U.S. 342, 357 [36 S. Ct. 370, 60 L. Ed. 679]; *State Board of Tax Comm'rs* v. *Jackson,* 283 U.S. . . . [527, 537, 51 S. Ct. 540, 75 L. Ed. 1248]."

This court has also used similar language in describing permissible classification. "The legislature has a wide discretion in the classification of property for taxation and in granting exemptions. . . . The classification must be reasonable and not arbitrary and must be based upon a distinction which bears a fair and substantial relationship to the object of the legislation so that all who are similarly situated are treated alike." *First Federal Savings & Loan Assn.* v. *Connelly,* 142 Conn. 483, 491, 115 A.2d 455, appeal dismissed, 350 U.S. 927, 76 S. Ct. 305, 100 L. Ed. 811; see also *Consolidated Diesel Electric Corporation* v. *Stamford,* 156 Conn. 33, 36, 238 A.2d 410.

(b) The plaintiffs in the present case contend that there is no real difference between dividends and other forms of investment income and hence the singling out of dividend income for taxation purposes is arbitrary and amounts to a denial of equal protection of the law. Various courts, however, have sustained similar distinctions. In *Welch* v. *Henry,* 305 U.S. 134, 143–44, 59 S. Ct. 121, 83 L. Ed. 87, the United States Supreme Court upheld a state tax on dividends, saying: "We think that the selection of such income for taxation at rates and with deductions not shown to be unrelated to an equitable distribution of the tax burden is not a denial of equal protection commanded by the Fourteenth Amendment. . . . Any classification of taxation is permissible which has reasonable relation to a legitimate end of governmental action. . . . And the distribution of a tax burden by placing it in part on a special class which by reason of the taxing policy of the state has escaped all tax during the taxable period is not a denial of equal protection." Among a plethora of decisions upholding analogous distinctions are: *Randolph* v. *Simpson,* 410 F.2d 1067, 1068 (5th

Cir., 1969) (Florida ad valorem tax differently treating tangible and intangible personal property upheld); *Barhorst* v. *St. Louis,* 423 S.W.2d 843, 846 (Mo.) (distinction between earned and unearned income upheld); *Personal Loan & Finance Co.* v. *Oklahoma Tax Commission,* 437 P.2d 1015, 1020 (Okla.) (distinction between "single" corporations and those with "parents" upheld); *Johnson* v. *Donovan,* 290 Minn. 421, 188 N.W.2d 864 ("recreational vehicles" a legitimate category for special tax treatment; *In re Opinion of the Justices,* 111 N.H. 136, 276 A.2d 821 (gross income of individuals and business entities subject to tax at different rates).

It is not the province of this court to pass on the wisdom of the General Assembly's decision nor, despite the plaintiffs' arguments to the contrary, does the speed with which it enacted the legislation necessarily affect its validity. "Only if it appears that there is no rational basis for the classification so that it is patently arbitrary may it be set aside as patently arbitrary." *Virgo Corporation* v. *United States,* 384 F.2d 569, 586 (3d Cir.). "As long as the statute may be justified on any reasonable theory, the legislature's determination will be upheld." *WHYY, Inc.* v. *Glassboro,* 50 N.J. 6, 13, 231 A.2d 608.

We conclude that the plaintiffs have not sustained their heavy burden of showing that the legislature's decision to tax dividends while leaving other investment income untaxed is clearly capricious, arbitrary and unconstitutionally discriminatory as to them and that they have not successfully negatived "every conceivable basis which might support it." *Madden* v. *Kentucky,* 309 U.S. 83, 88, 60 S. Ct. 406, 84 L. Ed. 590.

We find ourselves in agreement with the comment

by Professor Lester B. Snyder of the University of
Connecticut School of Law in his article entitled
"Tax Policy in the 1971 Connecticut General Assem-
bly," 46 Conn. B.J. 136: "Although the Connecticut
dividends and capital gains tax does not tax all in-
tangible property income, it does represent a reason-
able legislative attempt to tax the major items of in-
tangible wealth. Interest income was excluded from
the tax after a legislative determination that such a
tax might be oppressive to low-income, or retired
persons. While this judgment is quite debatable as
a matter of fact or policy, it is not *per se* uncon-
stitutional. Moreover, a quick glance at the wide
variety of selective taxing schemes in this and other
states clearly indicates that the long-standing pat-
tern of taxation has been to single out particular
items with exclusion or exemption of myriad others.
For example, the property tax base in Connecticut,
even as it applies to tangible property, has been con-
tinuously narrowed, the net effect being to levy a tax
on only certain items of personal property and real
estate; the Connecticut conveyance tax applies only
to certain real estate and not to conveyances of other
types of property, such as stocks and bonds; the
sales tax is applicable only to particular sales of per-
sonal property; and taxes on business net income
are levied only if the business happens to be a cor-
poration. These value judgments, as to how broad
or narrow to base a tax, must, of necessity, be left to
the legislative branch of government under our sepa-
ration of powers doctrine. Any attempt by the
courts to unscramble any part of the complex scheme
of state taxation, substituting their own judgment
for what is or is not a sound tax policy would subvert
the function of the judicial branch and ignore a
policy of judicial restraint enunciated by the United

States Supreme Court on many occasions in the past."

(c) Applying to the widow's exemption provided in § 12-506 (c) (3) of the act the same tests of constitutionality which we have already discussed, we come to the conclusion that this exemption provision is invalid. As the plaintiffs properly maintain, the only difference between the status of a "person who is unmarried and a widow on the last day of her taxable year" and a person who is unmarried and a widower is that of sex. "[M]ere difference is not enough: the attempted classification 'must always rest upon some difference which bears a reasonable and just relation to the act in which the classification is proposed, and can never be made arbitrarily and without any such basis.'" *Hartford Steam Boiler Inspection & Ins. Co.* v. *Harrison,* 301 U.S. 459, 462, 57 S. Ct. 838, 81 L. Ed. 1223. As we said in *In re Application of Griffiths,* 162 Conn. 249, 258, 294 A.2d 281: "'The basis for a reasonable classification must show such a difference as to justify the division. "A proper classification . . . must embrace all who naturally belong to the class—all who possess a common disability, attribute or qualification and there must be some natural and substantial difference germane to the subject or purposes of the legislation between those within the class included and those whom it leaves untouched."' *St. John's Roman Catholic Church Corporation* v. *Darien,* 149 Conn. 712, 723, 184 A.2d 42." See also *State* v. *Delgado,* 161 Conn. 536, 290 A.2d 338.

Insofar as the record discloses, the special exemption granted to a widow is predicated solely on sex and the death of a spouse. While there may be some reason which would justify a tax statute which sets apart surviving spouses as a class for special treat-

ment and within that class a subclass of female surviving spouses, no valid reason whatsoever for the latter discrimination solely on the basis of sex is disclosed in the body of the act nor has any been suggested to us. No other qualification such as need, a minimum income, dependent children or physical handicap is made a basis for this classification. Since all persons who have attained the age of sixty-five are granted the same exemption (§ 12-506 [c] [2]) the discrimination cannot be justified on the basis that women have a statistically greater life expectancy. A statute which on its face discriminates on the basis of sex establishes "a classification subject to scrutiny under the Equal Protection Clause." *Reed v. Reed,* 404 U.S. 71, 75, 92 S. Ct. 251, 30 L. Ed. 2d 225. The equal protection clauses of the state and federal constitutions apply to all persons regardless of their sex. In *Reed v. Reed,* supra, the United States Supreme Court recently held that a provision of the Idaho probate code which gave preference to men over women when persons of the same entitlement class apply for appointment as administrator of a decedent's estate was unconstitutionally discriminatory, saying: "In applying that clause [the equal protection clause], this Court has consistently recognized that the Fourteenth Amendment does not deny to States the power to treat different classes of persons in different ways. *Barbier v. Connolly,* 113 U.S. 27 (1885) [5 S. Ct. 357, 28 L. Ed. 923]; *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61 (1911) [31 S. Ct. 337, 55 L. Ed. 369]; *Railway Express Agency v. New York,* 336 U.S. 106 (1949) [69 S. Ct. 463, 93 L. Ed. 533]; *McDonald v. Board of Election Commissioners,* 394 U.S. 802 (1969) [89 S. Ct. 1404, 22 L. Ed. 2d 739]. The equal protection clause of that amendment does, however,

deny to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike,'" citing *Royster Guano Co.* v. *Virginia,* 253 U.S. 412, 415, 40 S. Ct. 560, 64 L. Ed. 989. The unanimous opinion by Chief Justice Burger concluded by saying: "By providing dissimilar treatment for men and women who are thus similarly situated, the challenged section violates the Equal Protection Clause." *Reed* v. *Reed,* supra, 77. There is nothing in the act itself which suggests any permissible legislative policy which would constitutionally justify discrimination because of sex in the amount of exemption allowed taxpayers by the act nor has any valid reason for this discrimination on the basis of sex been given on this reservation. In these circumstances, we must conclude that the discrimination solely on the basis of sex between the tax exemption afforded to persons who are widows on the last day of their taxable years vis-a-vis persons who are widowers on the last day of their taxable years is constitutionally impermissible in that it violates the equal protection clause. In the absence of some valid reason to the contrary, men and women similarly situated must be treated equally under the law.

It is pertinent to add that the invalidity of this one provision of the act does not result in the entire act being invalid. "To hold that legislation is valid as to one part and invalid as to another is not anomalous but consonant with principles long established.

*State* v. *Wheeler,* 25 Conn. 290, 299. Where two or more parts of a statute are challenged, the test is whether they are so mutually connected and depend-ent as to indicate a legislative intent that they should stand or fall together. *Branch* v. *Lewerenz,* 75 Conn. 319, 324, 52 A. 658. If that test is applied to this case, it is clear that the part we sustain is separate and distinct from the part we hold to be invalid. They are entirely severable provisions." *Amsel* v. *Brooks,* 141 Conn. 288, 300, 106 A.2d 152.

## II

We next consider the claim of the plaintiffs that "[c]hapter 224 is so ambiguously worded, internally inconsistent, unintelligible and loosely drafted as to be void for vagueness under the applicable due proc-ess provisions of the state and federal constitutions." They assert that "[a] declaration by this Court that this Chapter is void for vagueness would have a salutary effect upon the legislative process in this State. It would encourage the General Assembly to meet its responsibilities by drafting tax legislation which is carefully considered and properly con-structed rather than the midnight madness which this legislation portrays." The act is not free from ambiguity and certainly lacks the clarity to be de-sired and expected in revenue raising legislation. As specific problems arise and cases are presented for adjudication and a determination of the proper interpretation and application of the provisions of the act to particular situations, they will have to be resolved in due course. We must, however, decline to advise on abstract principles of law or to answer such a broad question as: "Are any of the sections of Chapter 224 void for vagueness?" See *United Oil Co.* v. *Urban Redevelopment Commission,* 158

Conn. 364, 373, 260 A.2d 596; *Adams* v. *Rubinow,* 157 Conn. 150, 168, 251 A.2d 49; *Holt* v. *Wissinger,* 145 Conn. 106, 109, 139 A.2d 353.

This principle applies as well to the claim of the plaintiffs that the act fails to provide definite procedural relief which satisfies the requirements of due process of law. The act expressly provides (§ 12-521) that any person aggrieved by the action of the tax commissioner in fixing the amount of any tax, penalty or interest provided by chapter 224 may apply to the commissioner for a hearing and a correction. Section 12-522 provides for an appeal to the Superior Court by any person aggrieved because of any order, decision, determination or disallowance of the tax commissioner. There is no suggestion in the plaintiffs' complaint or in the stipulation of facts that any of the plaintiffs have even sought procedural relief, much less been denied due process of law in any manner concerning any relief to which a right has been asserted. As we have already stated, "a plaintiff, in challenging the constitutionality of a statute, must sustain the burden of proving that the effect or impact of the challenged statute on him adversely affects a constitutionally protected right which he proves he has. 'This means a right which he proves that he has under the facts of his particular case and not merely under some possible or hypothetical set of facts not proven to exist.'" *Adams* v. *Rubinow,* supra, 152. "A statute may operate in a manner consistent with constitutional requirements when applied to one set of circumstances, although as to another it may produce a result which makes its operation unconstitutional. . . . Put another way, the constitutional validity of a statute must be tested by its effect on the one who challenges it under the particular circumstances of

his case and not under some other and different circumstances." *State* v. *Sul,* 146 Conn. 78, 81, 147 A.2d 686.

### III

A further contention of the plaintiffs is that the act unlawfully delegates to the tax commissioner power to adopt and enforce rules and regulations relating to the administration and enforcement of the act and by references to federal income tax law has improperly delegated to the United States Congress a portion of the legislative power of the Connecticut General Assembly.

As to the first of these contentions, it is the claim of the plaintiffs that the authority granted to the tax commissioner under §§ 12-508, 12-510, 12-516, 12-517 and 12-518 of the act violates the constitution of Connecticut, article first, § 8, articles second and third, § 1, in that it is an unlawful delegation of legislative power to the commissioner. In addition, they contend that these sections of the act undertake to delegate substantial duties to the commissioner without prescribing adequate standards for the exercise of his discretion. These contested sections of the act authorize the tax commissioner to prescribe forms for tax returns, to require the submission of data and records pertinent to the determination of the amount of tax due, to investigate and verify the accuracy of returns and, in general, to adopt and enforce rules and regulations relating to the administration and collection of the tax.

There is a clear distinction between the legislative function of defining and imposing a tax, which function is nondelegable, and the ministerial and administrative procedures to be followed in the assessment and collection of the tax. It is well established that "[a] Legislature, in creating a law complete in

itself and designed to accomplish a particular purpose, may expressly authorize an administrative agency to fill up the details by prescribing rules and regulations for the operation and enforcement of the law." *State* v. *Stoddard,* 126 Conn. 623, 628, 13 A.2d 586. The power granted to an administrative board or official may include, but is not limited to, the establishment of filing requirements, the hearing of administrative appeals, the finding of facts, and the determination of when as opposed to how and to what extent a tax may be imposed. See *Opinion of the Justices,* 97 N.H. 533, 81 A.2d 845; *Opinion of the Justices,* 96 N.H. 513, 68 A.2d 859; *Moore* v. *Langton,* 92 R.I. 141, 167 A.2d 558.

The legislative power constitutionally to delegate authority is, of course, not unlimited. For a delegation to be constitutionally sustained, "it is necessary that the statute declare a legislative policy, establish primary standards for carrying it out, or lay down an intelligible principle to which the administrative officer or body must conform, with a proper regard for the protection of the public interests with such degree of certainty as the nature of the case permits, and enjoin a procedure under which, by appeal or otherwise, both public interest and private rights shall have due consideration." *State* v. *Stoddard,* supra.

It is the plaintiffs' principal contention that the legislature failed to define with the requisite specificity primary standards governing the exercise of the tax commissioner's authority and that as a result "[t]he defects of the statute itself, combined with the lack of adequate standards, has fashioned the Commissioner into a legislator, and in many cases into a judge." We do not agree. While the act does not expressly state the purpose for

which it was enacted, it can hardly be doubted, in light of its legislative history, that the act was designed to raise much needed revenue in a manner consistent with the now generally settled federal practices and principles of income taxation. The General Assembly specifically levied the tax, prescribed the rate and defined the income subject to taxation as well as the persons who are required to pay. §§ 12-505, 12-506. It then authorized the tax commissioner to (1) prescribe the information required of the taxpayer, (2) to design forms for returns, (3) to require the submission of copies of federal income tax returns and supporting records, (4) to extend time limitations, and (5) to promulgate regulations for enforcement of the act and collection of the prescribed tax. §§ 12-508, 12-510, 12-516, 12-517, 12-518. In the comprehensive and complex area of taxation of income, it is neither uncommon nor unwise for a legislature to defer to the expertise of an official or group of officials in the areas of regulations and administration. See *Commissioner of Internal Revenue* v. *Stidger,* 386 U.S. 287, 296, 87 S. Ct. 1065, 18 L. Ed. 2d 53; *Anderson* v. *Tiemann,* 182 Neb. 393, 401, 155 N.W.2d 322; *Columbia Gulf Transmission Co.* v. *Barr,* 194 So. 2d 890, 895 (Miss.). "The legislature cannot delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which cannot be known to the law-making power, and must, therefore, be a subject of inquiry and determination outside of the halls of legislation." *Field* v. *Clark,* 143 U.S. 649, 694, 12 S. Ct. 495, 36 L. Ed. 294.

As long as revenue legislation sets out with specificity the rate of the tax, the instances where it is to be imposed and those who will be liable to pay it, there is no impermissible delegation of legislative power merely because the details of regulation and enforcement are left to administrative action. The plaintiffs have not established that the act unconstitutionally delegates to the tax commissioner any of the legislative powers of the General Assembly or that the standards the act prescribes for the exercise of the administrative and enforcement powers granted to the commissioner are not precise enough to serve as a "sufficient guide for the exercise of the discretion" which he must exercise. *Connecticut Baptist Convention* v. *McCarthy,* 128 Conn. 701, 705, 25 A.2d 656. As we noted in *Hardware Mutual Casualty Co.* v. *Premo,* 153 Conn. 465, 480, 217 A.2d 698, it is always conceivable that maladministration of the statute by the commissioner, in disregard of primary standards prescribed by the legislation, might constitute action which would have an unconstitutional impact on a taxpayer. "But," as we there said, "that is not this case. The plaintiffs have wholly failed to prove any such impact on themselves. This court cannot strike down a legislative enactment as unconstitutional merely because difficulties may be encountered in its administration, or on the mere possibility that it may be improperly administered. *Lyman* v. *Adorno,* 133 Conn. 511, 530, 52 A.2d 702."

The plaintiffs' second contention in this context is that the act's incorporation by reference of federal income tax law amounts to an unlawful delegation to Congress of the legislative power of the General Assembly and violates the tenth amendment to the constitution of the United States as well as article

first, § 8, articles second and third, § 1 of the constitution of Connecticut. Their claim is that although the General Assembly may properly incorporate by reference any provision of federal law, any incorporation of this nature must necessarily make reference to the incorporated law as it existed on a particular date. They point out that the various corporation business tax statutes previously considered by this court make reference to federal law as it existed "on the last day of the income year." See *First Federal Savings & Loan Assn.* v. *Connelly,* 142 Conn. 483, 492, 115 A.2d 455, appeal dismissed, 350 U.S. 927, 76 S. Ct. 305, 100 L. Ed. 811; *Singer Mfg. Co.* v. *Gilpatric,* 98 Conn. 192, 196, 118 A. 919. Thus, they contend that since the act does not expressly adopt federal income tax law as it existed on a specific date that it must, accordingly, be construed to refer not only to the federal tax law as it existed when the act was passed but also to any future amendments which may be adopted by Congress. It is their position that this constitutes an attempt by the General Assembly to adopt federal tax law as it may be enacted by Congress in the future and hence is not a lawful incorporation by reference but is rather an unconstitutional delegation of state legislative power to the Congress.

We are constrained to note that the validity of this argument is questionable since it is predicated on an assumption that the statute must be construed as an attempt by the General Assembly to adopt amendments which Congress may in the future make to federal tax law. Since the act makes no express provision in this regard, the interpretation claimed by the plaintiffs is not a necessary one. See *Anderson* v. *Tiemann,* supra. "Statutes are to be construed in light of their legislative history, their lan-

guage, the purpose they are to serve, and the circumstances surrounding their enactment. *Connecticut Light & Power Co. v. Sullivan,* 150 Conn. 578, 581, 192 A.2d 545; *Mack v. Saars,* 150 Conn. 290, 294, 188 A.2d 863; *Oppenheimer v. Connecticut Light & Power Co.,* 149 Conn. 99, 102, 176 A.2d 63." *Hartford Electric Light Co. v. Water Resources Commission,* 162 Conn. 89, 97, 291 A.2d 721. Furthermore, even if the interpretation which the plaintiffs claim were a correct one and the act were construed to incorporate not only federal tax law as it existed in 1971 when the act was adopted but also such amendments as Congress might adopt in the future, there is at least some authority that such legislation is constitutionally permissible. See *Alaska Steamship Co. v. Mullaney,* 84 F. Sup. 561 (D. Alas.), aff'd, 180 F.2d 805 (9th Cir.); *Hickel v. Stevenson,* 416 P.2d 236, 238 (Alas.); *In re Lasswell,* 1 Cal. App. 2d 183, 36 P.2d 678; *People ex rel. Pratt v. Goldfogle,* 242 N.Y. 277, 151 N.E. 452; *Commonwealth v. Alderman,* 275 Pa. 483, 151 N.E. 452; but see *Cheney v. St. Louis Southwestern Ry. Co.,* 239 Ark. 870, 872, 394 S.W.2d 731; *Hutchins v. Mayo,* 143 Fla. 707, 197 So. 495; *Featherstone v. Norman,* 170 Ga. 370, 153 S.E. 58; *Thorpe v. Mahin,* 43 Ill. 2d 36, 250 N.E.2d 633; *Dawson v. Hamilton,* 314 S.W.2d 532 (Ky.); *State v. Intoxicating Liquors,* 121 Me. 438, 442, 117 A. 588; *Opinion of the Justices,* 239 Mass. 606, 133 N.E. 453; *Wallace v. Commissioner of Taxation,* 289 Minn. 220, 184 N.W.2d 588; *Santee Mills v. Query,* 122 S.C. 158, 115 S.E. 202; *State ex rel. Kirschner v. Urquhart,* 50 Wash. 2d 131, 310 P.2d 261.[3]

---

[3] It is to be noted that some states have avoided any question about this problem by means of amendment of their constitutions. See *Matter of Garlin v. Murphy,* 51 Misc. 2d 477, 273 N.Y.S.2d 374; N.Y. Const., art. 3 § 22; Colo. Const., art. 10 § 9.

We refrain, however, from determining at this time this question of statutory interpretation and constitutional law. The precise question has neither been properly raised nor adequately presented in these proceedings. Moreover, the stipulation of facts does not indicate nor has our attention been called to any changes in federal tax law relevant to the issues in this case which have been effected since the passage of the act. The plaintiffs have not demonstrated how their rights have in any way as yet been infringed by the provisions of these portions of the act, and we will not presume that the General Assembly will not enact further or clarifying legislation at or before the time any change in the federal tax law becomes effective. At the present time, so far as the plaintiffs are concerned, the issue is merely academic and this court will not answer merely academic questions. *Congress & Daggett, Inc.* v. *Seamless Rubber Co.*, 145 Conn. 318, 323, 142 A.2d 137; *Burns* v. *Seymour*, 141 Conn. 401, 406, 106 A.2d 759.

## IV

A further contention of the plaintiffs is that a proper interpretation of § 12-506[4] requires that the basis for computing a capital gain or loss can be no earlier than December 31, 1970. Their argument is threefold: First, they maintain that § 12-506 of the General Statutes should, as a matter of statutory construction, be interpreted not to adopt the federal

---

[4] "[Public Acts, Spec. Sess., June, 1971, No. 8 § 10] Sec. 12-506. IMPOSITION OF TAX. (a) A tax is hereby imposed at the rate of six per cent on all dividends and gains from the sale or exchange of capital assets occurring after December 31, 1970, which have been earned, received in fact or constructively, accrued or credited to the taxpayer during his taxable year subject to the exemptions allowed in subsection (c) of this section."

basis for the taxation of capital gains but to tax, when realized, only accretions in value after December 31, 1970. Second, they argue that § 55-3[5] of the General Statutes requires that § 12-506 be construed to allow the taxpayer to use, instead of the federal basis for computing capital gains, the fair market value of the asset on December 31, 1970. Finally, they contend that if the statute is construed as adopting the federal basis for the computation of capital gain, that such a construction would render the statute impermissibly retroactive under the United States and Connecticut constitutions.

The plaintiffs' arguments center around the words in § 12-506 which impose a tax "on all dividends and gains . . . occurring after December 31, 1970." Their contention is that the word "occurring" as it is used in the statute is synonymous with the term "happening" and that the latter carries with it a connotation different and distinct from the traditional federal income tax concept of realization of gain or loss. We do not agree. "Courts, in construing statutes, consider their legislative history, their language, their purpose, and the circumstances surrounding their enactment." *Mack* v. *Saars,* 150 Conn. 290, 294, 188 A.2d 863; *Delinks* v. *McGowan,* 148 Conn. 614, 618, 173 A.2d 488. "Legislative intent is to be found not in what the legislature meant to say but in the meaning of what it did say. *Mad River Co.* v. *Wolcott,* 137 Conn. 680, 686, 81 A.2d 119. We are called upon to look beyond the literal meaning of the words to the history of the law, its language, considered in all its parts, the mischief the law

---

[5] "[General Statutes] Sec. 55-3. LIMITATION OF EFFECT OF CERTAIN ACTS. No provision of the general statutes, not previously contained in the statutes of the state, which imposes any new obligation on any person or corporation, shall be construed to have a retrospective effect."

was designed to remedy, and the policy underlying it. *Giammattei* v. *Egan,* 135 Conn. 666, 668, 68 A.2d 129. We must look, also, to the basic policy as disclosed by pre-existing legislation and the circumstances which brought about the enactment of the law under consideration. *Cedar Island Improvement Assn.* v. *Clinton Electric Light & Power Co.,* 142 Conn. 359, 364, 114 A.2d 535." *Lee* v. *Lee,* 145 Conn. 355, 358, 143 A.2d 154. "When two constructions are possible, courts will adopt the one which makes the statute effective and workable, and not one which leads to difficult and possibly bizarre results." *Muller* v. *Town Plan & Zoning Commission,* 145 Conn. 325, 331, 142 A.2d 524; *Bridgeport* v. *Stratford,* 142 Conn. 639, 644, 116 A.2d 508.

From a close examination of the entire act, it is obvious that the legislature intended to incorporate and adopt the federal basis for computation of capital gain and loss.[6] Section 12-505 specifically states: "Gains from the sale or exchange of capital assets means net gains as defined for federal income tax purposes." While there is some ambiguity in the meaning of "net gains" (a problem which we will discuss later in this opinion), we believe that the reference to the federal income tax structure is of controlling significance and decisive on the question of what basis is to be used in computing the tax on gains from the sale or exchange of capital assets.

"For federal income tax purposes" a capital gain is one "realized" through a sale or exchange of the asset. Internal Revenue Code § 1001 (a); *MacLaughlin* v. *Alliance Ins. Co.,* 286 U.S. 244, 249, 52 S. Ct.

---

[6] For a discussion of cases involving state legislation incorporating by reference the provisions of the federal Internal Revenue Code as they affect the determination of capital gains and losses, see Coyne, "State Taxation of Capital Gains: Is Use of the Federal Basis Constitutional?" 24 National Tax Journal 521.

538, 76 L. Ed. 1083. Absent such a sale or exchange, no taxable event has taken place even though the asset may, from an investment standpoint, be worth more to the holder than its initial cost plus adjustments for improvements. While the plaintiffs appear to agree that under the provisions of the act realization of gain is the taxable event,[7] they nevertheless contend that the only gains which "occur" after December 31, 1970, are the increases in value of the asset after that date. Thus, while they accept the established concept of no taxation until realization, they reject the equally well established corollary principle that when gains are realized they are then taxed on the difference between the value at the time of sale or exchange and the adjusted basis which is usually the initial cost.[8]

We find no indication either in the language of the act itself or in its legislative history that the General Assembly intended to adopt any other standard for taxing capital gain than that employed for federal tax purposes to which standard the act makes specific reference. Only gains realized after December 31, 1970, are taxed under the act. The fact that the amount of the tax depends, among other things, on the cost of the asset which may have been acquired prior to the enactment of the tax does not make the tax retrospective. The tax

---

[7] There is at least some indication that, for federal purposes, gains not realized may not constitutionally be taxed. See *Eisner* v. *Macomber*, 252 U.S. 189, 214, 40 S. Ct. 189, 64 L. Ed. 521.

[8] Under the provisions of § 1053 of the Internal Revenue Code, if the asset was purchased by the taxpayer prior to March 1, 1913, then his basis, subject to adjustment, is the fair market value of the asset on March 1, 1913. In addition, there are numerous other sections of the Internal Revenue Code which define, adjust or allocate a taxpayer's basis depending on the circumstances surrounding a transaction. See, for example, Internal Revenue Code §§ 301 (d), (f), 307, 1336 and others.

being imposed at the time of realization of the gain operates only in a prospective manner and, accordingly, does not operate counter to the proscription of § 55-3 of the General Statutes.

The plaintiffs argue that the act so interpreted violates the due process of law provisions of the United States and Connecticut constitutions. Their argument is, essentially, that a taxpayer's cost basis may have as its origin a transaction or valuation which took place over fifty years ago and thus the tax imposed on the profit resulting from the sale of the asset is not only retroactive but excessively so and constitutes a denial of due process. This argument, however, disregards the concept of taxation of the realization of the capital gain. While the value of a taxpayer's property may increase over a period of years, he realizes the profit and capital gain only on the sale or exchange of the property. The established concept of capital gain taxation and as it is implemented in the act is that the tax is levied on the final transaction, not on the gradual accretion in value.

There is authority for the proposition that a tax may be declared unconstitutional as a violation of due process when it is imposed on an event which took place long before the taxing statute was enacted; see *People ex rel. Beck* v. *Graves,* 280 N.Y. 405, 21 N.E.2d 371; but that circumstance is not present here. The capital gains tax is not levied on paper profits which accrue to the taxpayer while he owns the property but on profits which are, in fact, realized by the taxpayer when he sells the asset. The distinction was well pointed out by the United States Supreme Court in *MacLaughlin* v. *Alliance Ins. Co.,* 286 U.S. 244, 249, 250, 52 S. Ct. 538, 76 L. Ed. 1083, which dealt with a similar problem involving retro-

activity: "Realization of the gain is the event which calls into operation the taxing act, although part of the profit realized in one accounting period may have been due to increase of value in an earlier one. While increase in value of property, not realized as gain by its sale or other disposition, may, in an economic or bookkeeping sense, be deemed an addition to capital in a later period, . . . it is nevertheless a gain from capital investment which, when realized, by conversion into money or other property, constitutes profit which has consistently been regarded as income within the meaning of the Sixteenth Amendment and taxable as such in the period when realized. . . . Congress, having constitutional power to tax the gain, and having established a policy of taxing it, . . . may choose the moment of its realization and the amount realized, for the incidence and the measurement of the tax. Its failure to impose a tax upon the increase in value in the earlier years, assuming without deciding that it had the power, cannot preclude it from taxing the gain in the year when realized, any more than in any other case, where the tax imposed is upon realized, as distinguished from accrued, gain."

Various state courts when considering similar problems of retroactivity of taxing statutes have reached substantially identical conclusions. *Fullerton Oil Co.* v. *Johnson,* 2 Cal. 2d 162, 168, 39 P.2d 796; *Sweetland* v. *Franchise Tax Board,* 192 Cal. App. 2d 316, 13 Cal. Rptr. 432; *Norman* v. *Bradley,* 173 Ga. 482, 160 S.E. 413; *City National Bank* v. *State Tax Commission,* 251 Iowa 603, 102 N.W.2d 381; *Fidelity & Columbia Trust Co.* v. *Reeves,* 287 Ky. 522, 154 S.W.2d 337; *Olvey* v. *Collector of Revenue,* 233 La. 985, 99 So. 2d 317. *Thorpe* v. *Mahin,* 43 Ill. 2d 36, 250 N.E.2d 633, appears to have reached

a contrary conclusion but the decision was based primarily on the court's interpretation of the Illinois statute—Ill. Rev. Stat. c. 120, art. 2 (1969)—which expressly provided that the tax should operate prospectively beginning August 1, 1969.

A tax on realized capital gain does not operate in a retroactive manner merely because ascertainment of the amount of the gain is measured by the difference between the sale price received during the tax year and the taxpayer's basis which may have been established at some earlier time. The act is retroactive only to the extent that it taxes the realization of gain after December 31, 1970. This limited retroactive application is of no consequence. *Welch* v. *Henry,* 305 U.S. 134, 148, 59 S. Ct. 121, 83 L. Ed. 87.

## V

The remaining questions reserved for our advice involve questions of interpretation of the language of three provisions of the act. The first and most important is whether in computing the amount of tax owed a deduction is allowed for long term capital gains equivalent to the deduction provided to taxpayers by § 1202 of the Internal Revenue Code. As noted before, the tax is imposed on "all dividends and gains from the sale or exchange of capital assets" which, by the terms of § 12-505, means "net gains as defined for federal income tax purposes, after due allowance for losses and holding periods." The plaintiffs maintain that this language incorporates § 1202 of the Internal Revenue Code which provides for a deduction from gross income of 50 percent of the excess of net long term capital gain less net short term capital loss. Under that section of the Internal Revenue Code, assuming that one does not select the alternative tax for long term

capital gains, effectively only one-half net capital gain which is long term is subject to the federal income tax. The precise question we are called on to answer then is whether "net gains" as that term is used in § 12-505 should be computed in accordance with § 1202 of the Internal Revenue Code which provides preferential treatment for gains from the sale or exchange of assets which are classed as long term capital gains. In other words, does the language of § 12-505 mean that the proper base on which the 6 percent tax is imposed is 100 percent of net capital gain which is long term or 50 percent?

Despite its obvious importance in the tax plan implemented by the act, the language chosen by the legislature to define the base for imposition of the tax on capital gain is singularly lacking in clarity. As we have noted, § 12-505 defines "gains from the sale or exchange of capital assets" to mean "net gains as defined for federal income tax purposes, after due allowance for losses and holding periods but not nonrecognition of gains, all as provided under federal income tax law." A close examination of the federal Internal Revenue Code, however, discloses that neither the term "net gains" nor its singular counterpart is used in those federal statutes. To the extent that the term is used on the federal tax form for individual returns, it is devoid of meaning in the present context since "net gain" is used to describe the amount of gain both before and after the allowance of the § 1202 deduction. In these circumstances, we must seek to ascertain the meaning of the statute by the application of the settled rules for statutory construction to which we have hereinbefore referred, including a careful analysis not only of the language of the act but the history and policy underlying it. *Connecticut Light*

*& Power Co.* v. *Sullivan,* 150 Conn. 578, 581, 192 A.2d 545.

Some guidance is found in the repeated references to federal income tax law and particularly the provision that the taxable net gains are those defined for federal income tax purposes "after due allowance for losses and holding periods." While the reference to losses has little relevance to our present problem, the phrase "holding periods" does have decided significance. Under § 1222 of the federal Internal Revenue Code, a taxpayer may treat an item of capital gain or loss as long term only if the gain or loss results from "the sale or exchange of a capital asset held for more than 6 months." Since § 12-505 refers to "holding periods" there is a clear indication that the legislature intended by the use of that term to afford a different treatment to long term as opposed to short term capital gains. That differing treatment will only result if the 50 percent deduction for net long term capital gains less net short term capital losses is allowed.

The defendants contend that the phrase "after due allowance for losses and holding periods" as it is used in § 12-505 is not intended to define "net gains" but to modify the word "losses." Thus, they maintain that the reference to "holding periods" in the statute only affects the treatment of losses and not the treatment of gains. In support of this position, they rely on § 1211 (b) of the federal Internal Revenue Code as amended in 1969. That particular section allows a taxpayer to deduct from ordinary income a portion of his net loss if his capital losses exceed his capital gains. Similarly, § 1212 (b) of the federal Internal Revenue Code provides for long and short term adjustments to loss carry-overs.

While the defendants are undoubtedly correct in

their assertion that holding periods are an integral part of both of these federal tax provisions, this fact is not of significance in relation to the tax on capital gains imposed by the act. Section 1211 (b) of the federal Internal Revenue Code defines the tax consequences when, in any given year, the total of a taxpayer's capital transactions results in a net loss. Since § 12-505 of the General Statutes imposes a state tax on only "dividends and *gains*" (emphasis added), it is clear that a Connecticut taxpayer will not, in any one year where losses exceed gains, have a state tax liability resulting from his capital transactions, since, in that circumstance, he will have no net gain. In a year of net capital loss, the only effect § 1211 (b) of the federal Internal Revenue Code will have on a taxpayer's total state tax liability is a lessening of his adjusted federal income and consequent increase in the § 12-506 (c) (1) exemption which will be applied to his taxable dividend income. Similarly, § 1212 (b) of the federal Internal Revenue Code deals only with the computation of capital loss carry-over. While it is conceivable that application of the complex rules of that section will affect a taxpayer's state capital gains tax liability in future years depending on whether the assets sold to produce a net capital loss were held for more than six months, the application of this particular meaning of "holding periods" produces a rather curious result. The defendants would have us hold that an individual is taxed on the full amount of his capital gain without regard to its long or short term character yet, if a net capital loss is sustained in any one tax year, then a whole set of complex rules, wholly dependent on the length of time the assets were held, would come into play. It is inconceivable that the legislature intended this result particularly in light

of their use of the phrase "all as provided under federal income tax law" immediately after the reference to allowances for holding periods and losses. While the statutory language is far from unambiguous, the most reasonable interpretation of this language is that it was intended to permit the allowance of the § 1202 deduction.

The defendants also call our attention to § 1250 of the federal Internal Revenue Code and point out that that particular section deals with both capital gains and holding periods. Section 1250 is the compilation of a rather complex set of rules governing the treatment of gain from the sale or exchange of certain depreciable realty. Without dwelling on its subtleties, it is sufficient to note that § 1250 provides that under certain circumstances gain from the sale of property on which depreciation allowances were allowed will be treated as ordinary income. The effect of this section then, as far as Connecticut is concerned, is to reduce the amount of state taxable gain. But the operation of § 1250 on the Connecticut capital gains and dividends tax is not by virtue of the reference in § 12-505 to "holding periods" but rather by virtue of the repetitive reference in the statute to federal income tax law.

The defendants' arguments relative to specific sections of the federal Internal Revenue Code merely enumerate possible sections to which the term "holding periods" may refer but they in no way illustrate why § 12-505 does not incorporate by reference all sections of the federal Internal Revenue Code when it refers to "net gains as defined for federal income tax purposes." In this regard, the defendants contend that "net gains" as the term is used in the statutes must refer to "net capital gain" which is defined by § 1222 (9) of the federal Internal Revenue

Code to be the excess of gains from sales or exchanges of capital assets over the losses from such sales or exchanges without reference to the 50 percent deduction for net long term capital gains less short term capital losses provided by § 1202. While it is certainly possible that the legislature meant to use the term "net capital gain" rather than "net gain" it nevertheless did not do so. "It is the expressed intent of the legislature which controls, and that intent is to be found in the meaning of what it says"; *Adams* v. *Vaill*, 158 Conn. 478, 483, 262 A.2d 169; and not some unexpressed or supposed state of mind of the General Assembly. See *Rivera* v. *I. S. Spencer's Sons, Inc.,* 154 Conn. 162, 166, 223 A.2d 808. The language of the statute shows a clear intent on the part of the legislature to adopt, insofar as it was practical, the federal system for taxing capital gains income. When it departed from the federal income tax law, it did so specifically. In this light, it would be unwarranted and unreasonable to hold that "net gains" as that term is used in § 12-505 of the General Statutes did not incorporate the 50 percent deduction of net long term capital gains less net short term capital loss provided for in § 1202 of the federal Internal Revenue Code.

This interpretation of the act finds support not only in the language of the statute itself but most significantly in its legislative history. The first capital gains tax was enacted by the General Assembly in 1969 by Public Act No. 1 of the June, 1969, special session of the General Assembly, printed as chapter 224 (§§ 12-505 through 12-522 of the General Statutes). This act, which we will hereafter refer to as the 1969 act, was repealed by the 1971 act which is the subject of the present action. While the language of the 1969 act was different in many respects

from the one under consideration here, it did define gains from the sale or exchange of capital assets to mean " 'net gain' as that amount is computed under the internal revenue code of the United States." In Regulation No. 12-518-1 (a) and (b), the tax commissioner ruled that the 1969 statute applied to capital gains "which are recognized and taxable for federal income tax purposes . . . 'net gain' means the combination of net long-term capital gains and net short-term capital gains less the smaller of fifty per cent of such combination or fifty per cent of net long-term capital gain." The Tax on Capital Gains, Regs. Conn. State Agencies § 12-518 (a), (b). Thus, when the General Assembly enacted Public Act No. 8 on the same subject during the 1971 special session, it can be presumed that it did so with knowledge of the tax commissioner's interpretation of the phrase "net gain" and his regulation for payment of the tax on 50 percent rather than 100 percent of net long term capital gain less net short term capital loss. While the 1971 legislature made some minor changes from the language of the 1969 act, such as changing "net gain" to "net gains" and "as that amount is computed under the internal revenue code of the United States" to "as defined for federal income tax purposes" it also expressly added the further provision "all as provided under federal income tax law." The conclusion is inescapable that the 1971 legislature used the term "net gains" not only in light of federal income tax practice but in light of the definition of that term in the administrative regulation then in force. *Shell Oil Co.* v. *Ricciuti,* 147 Conn. 277, 285, 160 A.2d 257. If it in fact intended to deviate from federal income tax policy and to change existing state law by imposing the tax on 100 percent of net capital gain rather

than allowing the § 1202 deduction, it could easily have so indicated. We not only find no such indication but the changes which were adopted in 1971 indicate to the contrary. We conclude that the answer to reserved question 17 is "No" and the answer to reserved question 18 is "Yes" and that insofar as the deduction for 50 percent of net long term capital gain less net short term capital loss is concerned it must be allowed.

The last two inquiries raised on this reservation concern the exemption afforded all taxpayers under § 12-506 (c) of the General Statutes and the question whether net capital loss may be used to offset dividend income. As to the first problem, § 12-506 (c) (1) provides that the normal exemption shall be $2000 "multiplied by a fraction whose numerator is dividend and capital gain income" and whose denominator is the taxpayer's federal adjusted gross income less certain other specified items of income. The plaintiffs maintain that, under certain circumstances, the exemption fraction converted to percentage can exceed 100 percent thus resulting in an exemption greater than $2000. An example of this would be a situation where an individual receives all his income from dividends. Since the first $100 of dividend income is not taxed for federal purposes but is taxed under the 1971 act, the exemption fraction in percentage terms will inevitably exceed 100 percent.

From a review of the exhibits which include the 1971 Connecticut Capital Gains Tax Returns of the plaintiffs Marsh and Miller, we note that only the plaintiff Marsh listed an exemption fraction computed at greater than 100 percent. His argument for the greater exemption is based on the fact that the numerator of the exemption factor included the

full amount of his capital gains whereas the denominator, his federal adjusted gross income, takes into account the 50 percent deduction provided for by § 1202 of the federal Internal Revenue Code. Our decision on the meaning of "net gain" as that term is used in § 12-505 of the General Statutes effectively sets this controversy to rest as to him since we have concluded that the "capital gain income" which is part of the numerator of the exemption fraction is computed in accordance with the provisions of the federal Internal Revenue Code with due regard for the deduction provided for in § 1202 of that code. Thus, as to these plaintiffs, the question whether under any circumstances the exemption may exceed $2000 is academic and we decline to answer it.

We turn next to the question whether net capital losses may be used to reduce taxable dividends. Section 12-506 provides that a 6 percent tax is imposed on "all dividends and gains." The plaintiffs argue that since gains are computed with regard to an allowance for losses, net capital losses may be used to reduce the total of dividends subject to the tax. We do not agree. The statute provides for the taxation of only two different forms of income—from dividends and from capital gains. As we have noted, it does not, as does the federal income tax, tax other forms of income such as interest, rents or earnings from labor. Because the state act selects only these two forms of income for taxation, the provision of federal tax law allowing for a limited deduction of net capital loss from total income is not applicable, although we note that to some extent federal law will affect loss carry-overs in years after 1971. See Int. Rev. Code of 1954 §§ 1211 (b), 1212 (b). The provisions of the federal

Internal Revenue Code which are incorporated into computation of the state tax on dividends and capital gains are generally only those which relate to those two specific subjects of tax. The incorporation does not extend to an allowance of net capital losses to reduce taxable dividend income and it does not appear that either the intent or the language of the act permits it. Accordingly, the answer to reserved question 20 is "No."

## VI

The Superior Court is advised as follows: We have been restricted, as we indicated at the beginning of this opinion, to the facts set forth in the stipulation, and on these facts we cannot find that the plaintiffs have sustained their burden of proving unconstitutionality except as to that portion of the act which purports to provide an exemption to any person who is unmarried and a widow on the last day of her taxable year which is two and one-half times the exemption amount as calculated in subdivision (1) of § 12-560 (c). As we have noted, some of the questions were not pressed in this court. Some of the remaining questions propounded are academic and as to some others the plaintiffs have not established their entitlement to an answer or an answer cannot be given with greater precision than indicated in our discussion of the question. Subject to these comments: Questions 1 (a) and (b); 7 (a), (b), (c), (d) and (e); 15 (a) and (b); 17, 19 and 20 in the reservation are answered "No"; and questions 3 (a), (b) and (c); 12, 13, 14, 16 and 18 are answered "Yes."

No costs will be taxed in this court in favor of any party.

In this opinion the other judges concurred.