STATE OF CONNECTICUT *v.* ENRIQUE C. GONZALEZ
(5807)

SPALLONE, BIELUCH and STOUGHTON, Js.

*(One judge dissenting)*

Argued December 17, 1987—decision released April 26, 1988

*Robert P. Dutcher,* for the appellant (defendant).

*Susan E. Gill,* assistant state's attorney, with whom, on the brief, was *Frank Iannotti,* assistant state's attorney, for the appellee (state).

STOUGHTON, J. The defendant was convicted, after a trial to a jury, of operating under the influence of intoxicating liquor in violation of General Statutes (Rev. to 1985) § 14-227a (a).[1] The defendant submitted a request

---

[1] "[General Statutes (Rev. to 1985)] Sec. 14-227a. OPERATION WHILE UNDER THE INFLUENCE OF LIQUOR OR DRUG OR WHILE IMPAIRED BY LIQUOR. (a) OPERATION WHILE UNDER THE INFLUENCE. No person shall operate a motor vehicle on a public highway of this state or on any road of a district organized under the provisions of chapter 105, a purpose of which is the construction and maintenance of roads and sidewalks, or on any private

to charge the jury on the offense of operating while impaired, General Statutes (Rev. to 1985) § 14-227a (b),[2] as a lesser included offense of § 14-227a (a). The defendant now appeals from the trial court's denial of his request.

The state offered evidence from which the jury might reasonably have found the facts as follows. On June 21, 1985, members of the Connecticut state police were running a spot check for drunk drivers on the eastbound lane of Interstate Route 95 at the West Haven toll plaza. At about 11 p.m., the defendant drove up in the exact change lane behind another car. A trooper was in each lane and talked to each operator as the operator paid the toll. Trooper Peterson saw the defendant feel around for the money for the toll, and he smelled a very strong odor of alcohol. He had not noticed the defendant's manner of operation because he was watching the cars as they entered the lane and there was a car ahead of the defendant's car. Peterson told the defendant of the spot check and turned back to make sure oncoming traffic stopped while he had the defendant drive off the highway to a parking area. Peterson asked the defendant to get out of his car, and noticed

road on which a speed limit has been established in accordance with the provisions of section 14-218a, or in any parking area for ten or more cars or on any school property while under the influence of intoxicating liquor or any drug or both."

[2] "[General Statutes (Rev. to 1985)] Sec. 14-227a. . . . (b) OPERATION WHILE IMPAIRED. No person shall operate a motor vehicle on a public highway of this state or on any road of a district organized under the provisions of chapter 105, a purpose of which is the construction and maintenance of roads and sidewalks, or on any private road on which a speed limit has been established in accordance with the provisions of section 14-218a, or in any parking area for ten or more cars or on any school property while his ability to operate such motor vehicle is impaired by the consumption of intoxicating liquor. A person shall be deemed impaired when at the time of the alleged offense the ratio of alcohol in the blood of such person was more than seven-hundredths of one per cent of alcohol, by weight, but less than ten-hundredths of one per cent of alcohol, by weight."

that the defendant held onto the door as he got out. The defendant was laughing and giggling and when he spoke his speech was slurred as if his tongue was heavy. His choice of words was very confused. His walk was very unstable, his eyes were very glassy and bloodshot and his face was flushed. He fumbled while getting out his license and registration. The defendant agreed to take a number of field sobriety tests. The first test was a balance test in which Peterson asked the defendant to stand straight with his hands at his side and to lift one foot six inches and hold it there for about thirty seconds. The defendant performed the test with each foot, but was unable to hold either foot up more than a few seconds. Peterson administered a walking test which consists of walking a straight line placing one foot in front of the other heel to toe. He had the defendant try to take eight steps forward, turn around and take seven steps back. The defendant was unable to touch heel to toe and could not perform that test. Peterson then had the defendant tilt his head backward, close his eyes, point the index finger straight ahead and then touch his nose. The defendant was unable to point forward and missed his nose with both hands. Peterson then asked the defendant if he knew the alphabet and the defendant said that he did. The defendant said that he understood English, but when asked he was unable to start reciting the alphabet in English. Peterson then asked the defendant to recite the alphabet in Spanish, but the defendant was unable even to start it. Peterson noticed a strong odor of alcohol during the tests and he concluded that the defendant had failed to pass any of the sobriety tests. He concluded that the defendant was intoxicated and he placed him under arrest. Peterson then read the defendant his constitutional rights.[3] The defendant said

---

[3] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

that he understood his rights and that he did not want to consult a lawyer and that he understood that his answers to questions would be used against him. He said that he had been drinking and that he had consumed six beers and a half-pint of rum in his car and had nothing to eat between New York City and the West Haven toll. Peterson saw several empty beer cans on the floor of the car and an empty rum bottle in a paper bag on the front seat. The defendant did not know the time or what town he was in.

The defendant testified that he could recite the alphabet in English from the letter "a" through the letter "f" and that he could do the same in Spanish. He said that on June 21, 1985, he worked for eight hours until 4:30 p.m. in West Haven. He drove to Wallingford to pick up his girlfriend and had a drink of Bacardi and an egg sandwich at her house. He left Wallingford with his girlfriend at about 5:30 or 5:45 p.m. to drive her to New York City. He stopped in West Haven and in Greenwich and had a drink of Bacardi in each place. He stopped "somewhere else" and bought a half-pint of Bacardi and two beers. When they arrived at their destination in New York, he did not want to go in, so he had one more shot of Bacardi and one beer. His girlfriend had the other beer and he gave her the bottle of rum because he did not want to have it in the car. After he left his girlfriend, he started back to Connecticut at about 8:30 p.m. He made one stop to buy a hamburger which he ate in the car. There were no beer cans or bottles in the car and he did not have a half-pint Bacardi bottle or any empty bottles in his car. He did not go to the exact change lane at the West Haven toll booth, and when he stopped the woman collecting the toll asked him if he could drive and told him to stay there. She told him not to move his car, and then Peterson came over and told him to drive to the parking lot. He got out of the car and he had his

license, registration and insurance card all ready. Peterson told him to say the alphabet and he told Peterson that he just knew a couple of letters and he recited it from "a" through "f." The defendant further testified that he did not tell Peterson anything at all about how much he had been drinking and the alcohol he had consumed did not affect his driving in any way. He was able to walk without assistance, did not stumble or sway on his feet and did not feel that he had to hold onto the car to stand up. He explained that he could not get his legs straight after an hour and a half sitting down and his legs felt tired.

The defendant also called his sister to testify. She said that her brother had telephoned her on June 21, 1985, at about 11 or 11:30 p.m. and asked her to pick him up because he had been arrested. His speech was normal and clear. She drove to the West Haven toll area, arriving there around 12 or 12:30. Her brother was waiting in the parking lot, and he was laughing and smiling. He did not seem to her to be under the influence of alcohol and his speech was not slurred. She saw no problem with the way he walked. To her, he seemed only to be tired. She also testified that she did not know what "under the influence" meant and that she had not really paid attention to how her brother was walking.

The defendant argues, in brief, that driving while under the influence is to drive while one is impaired "to an appreciable degree." 3 D. Wright, Connecticut Jury Instructions (2d Ed.) § 930, p. 1558. He argues that, since one cannot be under the influence without being impaired, impairment is a lesser included offense of operating while under the influence. Thus, the trial court erred in refusing to instruct the jury as the defendant requested. The sole issue before us is whether driving while impaired; General Statutes (Rev. to 1985) § 14-227a (b); is a lesser included offense of

driving while under the influence. General Statutes § 14-227a (a). A criminal defendant is entitled to a lesser included offense instruction in those circumstances where "it is not possible to commit the greater offense . . . without having first committed the lesser; [and] there is some evidence . . . which justifies conviction of the lesser offense . . . ." *State* v. *Whistnant,* 179 Conn. 576, 588, 427 A.2d 414 (1980). We, therefore, must determine if it is possible to commit the crime of operating a motor vehicle while "under the influence" without necessarily operating while "impaired," and whether there was evidence presented sufficient to convict the defendant of the latter. We turn to the language of the statute, the legislative history, and relevant case law in this analysis.

The intent of the legislature is to be ascertained from the language of the statute if it is plain and unambiguous. *State* v. *Ellis,* 197 Conn. 436, 442, 497 A.2d 974 (1985). The state contends that the statutory definition of the offense of operation while impaired authorizes a conviction only when an operator's blood alcohol ratio falls between the prescribed limits of .07 and .1 percent. *State* v. *Hancich,* 200 Conn. 615, 629, 513 A.2d 638 (1986) (*Shea, J.,* concurring).

General Statutes (Rev. to 1985) § 14-227a (b) provided that "[n]o person shall operate a motor vehicle . . . while his ability to operate such motor vehicle is impaired by the consumption of intoxicating liquor. *A person shall be deemed impaired* when at the time of the alleged offense the ratio of alcohol in the blood of such person was more than seven-hundredths of one per cent of alcohol, by weight, but less than ten-hundredths of one per cent of alcohol, by weight." (Emphasis added.) General Statutes (Rev. to 1985) § 227a (d) (3) provided that "evidence that at such time the ratio of alcohol in the blood was more than seven-hundredths of one per cent of alcohol, by weight, but less than ten-

hundredths of one per cent of alcohol, by weight, shall constitute impairment within the meaning of this section . . . ." (Emphasis added.) The statute provides no definition of driving while impaired apart from the blood alcohol parameters set forth above. The legislature has provided us no definition of impairment in a behavioral context, nor have our courts developed one.

In spite of these clear indications that prosecutions for operating while impaired are warranted only when evidence of a certain blood alcohol content exists, we will turn to the legislative history. In discussing Public Acts 1983, No. 83-534, Senator Howard T. Owens, Jr., stated: "It establishes a new offense of driving while impaired, blood alcohol content of above .07 or below .10 and imposes a penalty of an infraction." 26 S. Proc., Pt. 13, 1983 Sess., p. 4424. Additionally, Representative Christopher Shays stated: "It establishes a new offense called impairment. If someone's blood alcohol content is between .07 and below .10 that is an offense, an infraction." 26 H.R. Proc., Pt. 19, 1983 Sess., p. 6676.

From the foregoing, it is clear that the legislature did not intend to establish degrees of intoxication but to provide specifically that the infraction of operation while impaired occurred only when the ratio of an operator's blood alcohol content fell within certain limits. If we were to read the statute as the defendant desires us to do, the intoxicated driver could seek to avoid the penalty for driving under the influence through simply refusing to take the test and then offering testimony contradicting that of the officer. We are unwilling to do this. There was no evidence that the defendant's blood alcohol level fell within the parameters set forth in General Statutes § 14-227a (b), and hence the defendant fails the aspect of the *Whistnant* decision which requires that there be a sufficient evidentiary basis on

which to instruct the jury on a lesser included offense. *Whistnant,* supra, 586–88.

Our Supreme Court had occasion to consider whether a lesser included offense instruction of operating while impaired was warranted in a prosecution for driving while under the influence. In *State* v. *Hancich,* supra, the defendant's blood alcohol level was measured at .165 percent. The majority held that there was no error in the trial court's refusal to instruct the jury on driving while impaired as a lesser included offense because the defendant had introduced no evidence from which a jury could have found that the defendant was impaired as opposed to under the influence. The court did not define impairment or how driving while impaired differs from driving while under the influence, nor did it expressly hold that driving while impaired was a lesser included offense of driving while under the influence.

Here, too, there was substantial evidence that the defendant was under the influence, although his own testimony was that the alcohol he had had to drink did not affect his driving in any way. His testimony conflicted sharply in many respects with that of the police officer who made the arrest, but the import of it was not that his ability to operate was impaired but that his driving was not affected at all by what he had had to drink.

We decline to formulate or adopt a behavioral definition of driving while impaired when the applicable statute, by its very terms, provides that one commits the offense only when one's blood alcohol ratio falls between .07 and .1 percent.[4] In the absence of such evi-

---

[4] We note that General Statutes (Rev. to 1985) § 14-227a (f) provided that evidence of a defendant's refusal to submit to a blood, breath, or urine test shall, under certain circumstances, be admissible in prosecutions under subsection (a) or (b) of that section. This, the defendant maintains, indicates that the legislature intended the offense of impairment to be provable by other evidence. It is equally likely, however, that the legislature knew that

dence, the trier of fact would necessarily have to engage in speculation as to whether a defendant's behavior reflected a blood alcohol ratio between .07 and .1 percent. On these facts, there was no basis on which to instruct a jury on the offense of operating while impaired.

There is no error.

In this opinion SPALLONE, J., concurred.

BIELUCH, J., dissenting. The sole issue before this court is whether, in the absence of blood alcohol evidence, operation of a motor vehicle while impaired by liquor, in violation of General Statutes (Rev. to 1985) § 14-227a (b), is a lesser included offense of operation under the influence of liquor, in violation of General Statutes (Rev. to 1985) § 14-227a (a). The majority opinion holds that since the operation while impaired statute, "by its very terms, provides that one commits the offense *only* when one's blood alcohol ratio falls between .07 and .1 percent," it cannot be a lesser included offense of operation under the influence of liquor. (Emphasis added.) I disagree with that conclusion.

The arrest of the defendant occurred on June 21, 1985. The statutes relating to driving after drinking have been undergoing progressive development in recent years. For that reason, we must confine our analysis of the question before us to the law in effect on the date of the offense. General Statutes (Rev. to 1985) § 14-227a (b) provided: "No person shall operate a motor vehicle . . . while his ability to operate such motor vehicle is impaired by the consumption of

blood alcohol evidence which indicates impairment may come from sources other than a test administered by the police, such as a test conducted by a medical expert at the defendant's request. Impairment could thus be established even though the defendant elected not to take the test provided by the police.

intoxicating liquor. A person shall be deemed impaired when at the time of the alleged offense the ratio of alcohol in the blood of such person was more than seven-hundredths of one per cent of alcohol, by weight, but less than ten-hundredths of one per cent of alcohol, by weight."

In determining the true meaning of a statute when there is genuine uncertainty as to how it should apply, identifying the problem in society to which the legislature addressed itself by examining the legislative history of the statute under litigation is helpful. *State* v. *Gaines,* 196 Conn. 395, 400, 493 A.2d 209 (1985); *State* v. *Belton,* 190 Conn. 496, 505–506, 461 A.2d 973 (1983); *State* v. *Campbell,* 180 Conn. 557, 562, 429 A.2d 960 (1980).

General Statutes (Rev. to 1985) § 14-227a (b) had its genesis in the 1983 legislative session as Substitute House Bill No. 6420. This bill, as reported favorably by the committee on the judiciary, was entitled "An Act Concerning the Penalties for Drunk Driving." It created three degrees of the offense of operating a motor vehicle under the influence of liquor, with proportionate penalties, and varying with a person's blood alcohol percentage as follows: first degree—.2 percent or more; second degree—.15 percent or more, but less than .2 percent; third degree—.1 percent or more, but less than .15 percent. The bill also created a fourth offense as follows: "A person is guilty of operating a motor vehicle while impaired when the evidence establishes that such person was operating a motor vehicle and at the time of the alleged offense the ratio of alcohol in the blood of such person was five-hundredths of one per cent or more of alcohol, by weight, but less than ten-hundredths of one per cent of alcohol, by weight, *and* additional competent evidence is presented indicating that at the time of the alleged offense the ability of such person to operate the motor vehicle was

impaired by the consumption of intoxicating liquor."
(Emphasis added.) The penalty provided was a fine of
not more than five hundred dollars.

Other relevant new provisions were as follows: Evidence that the defendant refused to submit to a blood, breath or urine test requested under the law was admissible in any criminal prosecution for operation under the influence of liquor or while impaired by liquor. If any person, after being arrested for driving while impaired by the consumption of liquor, refused to submit to a blood alcohol test, the arresting officer was required to revoke his operator's license immediately for twenty-four hours. A sworn report to the commissioner of motor vehicles must then be made setting forth "the grounds for the officer's belief that there was probable cause to arrest such person for operating a motor vehicle . . . while his ability to operate such motor vehicle is impaired by the consumption of intoxicating liquor . . . ." Thereafter, a suspension of license for ninety days followed, subject to an immediate administrative hearing to determine, inter alia, the existence of probable cause for the arrest. A subsequent refusal of a blood alcohol test called for a further sworn report of probable cause to arrest, and a similar hearing after suspension of the operator's license.

The first consideration of the proposed legislation took place in the House of Representatives. During the debate, several amendments were adopted to give the bill its final form as Public Acts 1983, No. 83-534, of which General Statutes (Rev. to 1985) § 14-227a (b) was an integral part. House amendment schedule "A" was the most comprehensive. By this amendment, the proposed three degrees of operation under the influence of liquor were abolished. Instead, the amendment provided for increased penalties upon conviction for first and subsequent offenses.

The most important change was the adoption of what later became General Statutes (Rev. to 1985) § 14-227a (b). For the per se violation of operation under impairment, the threshold blood alcohol level was increased from .05 to more than .07 percent, and its criminal classification was reduced from a misdemeanor to an infraction. The judiciary committee's proposal requiring additional evidence of impaired driving was removed in amendment schedule "A." Evidence of a refusal to submit to a blood alcohol test was now admissible in the criminal prosecution of operation under the influence only. Continued in this amendment were the provisions that the officer make a sworn report to the commissioner of motor vehicles of his grounds to believe probable cause existed to make the arrest, and for proof of such probable cause at the subsequent suspension hearing. Such report and proof were also required upon a subsequent refusal to submit to a blood alcohol test.

The only remarks on the floor during the consideration of this amendment were these of Representative Christopher Shays: "It establishes a new offense called impairment. If someone's blood alcohol content is between .07 and below .10, that is an offense, an infraction." 26 H.R. Proc., Pt. 19, 1983 Sess., p. 6676.

Of significance in this legislative review is the adoption of house amendment schedule "D." This was a further amendment to schedule "A" adopted earlier and provided in relevant part as follows: "In any criminal prosecution for a violation of [operation under the influence of liquor *or operation while impaired*], evidence that the defendant *refused to submit* to a blood, breath or urine test requested in accordance with section 14-227b shall be admissible provided the requirements of subsection (b) of said section have been satisfied." (Emphasis added.) The legislative proceedings contain no explanation for the extension to prosecutions for

operation while impaired of this evidential rule, originally included in the committee bill, but previously excluded by amendment schedule "A."

Also relevant to our analysis of this legislative history of § 14-227a (b) is house amendment schedule "G," which was rejected by that body. This amendment sought to establish a "per se" violation standard for operating a motor vehicle under the influence of intoxicating liquor "while the ratio of alcohol in the blood of such person is ten-hundredths of one per cent or more of alcohol, by weight."[1] During the debate on this proposal, Representative Robert Farr made these remarks: "[I]n the bill in chief, we in fact have established a per se law. The bill in chief says that .07 to or below .1 is per se, a violation. And that's all we are doing here is establishing .1 or above as a violation." 26 H.R. Proc., Pt. 19, 1983 Sess., p. 6850.

Further relevant to our legislative review is house amendment schedule "L," which failed of adoption. This amendment proposed to limit the definition of driving while impaired by restoring the two-fold requirement of proof originally proposed in the committee bill, but rejected by amendment schedule "A." It provided as follows: "A person is guilty of operating a motor vehicle while impaired when the evidence establishes that such person was operating a motor vehicle and at the time of the alleged offense the ratio of alcohol in the blood of such person was more than eight-hundredths of one per cent of alcohol, by weight, but less than ten-hundredths of one per cent of alcohol, by weight, *and* additional competent evidence is presented indicating that at the time of the alleged offense the

---

[1] Such a "per se" violation of operating a motor vehicle while under the influence of intoxicating liquor was adopted in 1985 by Public Acts 1985, No. 85-596, § 1.

ability of such person to operate the motor vehicle was impaired by the consumption of intoxicating liquor." (Emphasis added.)

Upon receipt of Substitute House Bill No. 6420, as amended by the House of Representatives, the Senate adopted a further amendment not relevant to driving while impaired. In the debate on approval of the bill with all amendments, Senator Howard T. Owens, Jr., made the following explanatory remarks: "It establishes a new offense of driving while impaired, blood alcohol content of above .07 or below .10 and imposes a penalty of an infraction. I can say that the original plan was to make that a criminal misdemeanor. I thought and someone had talked about a .05 to a .10 level and I thought that could be two or three beers and maybe that's not what we were trying to come at and to not make it where they have a criminal penalty, .07 to below .10 is obviously impaired but does not reach the test by any expert's opinion of being under the influence or being intoxicated." 26 S. Proc., Pt. 13, 1983 Sess., p. 4424. As amended by the Senate, the bill was finally approved by the House of Representatives on June 7, 1983. Upon signing by the Governor, the bill became Public Acts 1983, No. 83-534.

The precise question raised by this appeal is one of first impresssion in this state. It is helpful, therefore, to examine the particular statute in effect, its language and its legislative development. See *Penfield* v. *Jarvis*, 175 Conn. 463, 466, 399 A.2d 1280 (1978). In construing statutes, courts consider their legislative history, their language, their purpose, and the circumstances surrounding their enactment. We look to the history of the law, its language, considered in all its parts, the mischief the law was designed to remedy, and the policy underlying it. *Kellems* v. *Brown*, 163 Conn. 478, 505–506, 313 A.2d 53 (1972), appeal dismissed, 409 U.S. 1099, 93 S. Ct. 911, 34 L. Ed. 2d 678 (1973).

The cardinal rule is that statutes are to be construed so as to carry out the expressed intent of the legislature. While the intent of the statute must be ascertained from the language used if it is clear and unambiguous, where the language is of doubtful meaning, the statute is to be construed in the light of all of its provisions, the object which it seeks to accomplish and all other relevant circumstances. *Jarvis Acres, Inc.* v. *Zoning Commission,* 163 Conn. 41, 46, 301 A.2d 244 (1972); *Anderson* v. *Ludgin,* 175 Conn. 545, 552, 400 A.2d 712 (1978). The debate surrounding passage of a law may be an aid to statutory construction if it sheds light on the legislature's purpose. The title and stated purpose of the legislation are also valid aids to construction. *Anderson* v. *Ludgin,* supra, 545. No word in a statute should be treated as superfluous or insignificant. *Kulis* v. *Moll,* 172 Conn. 104, 111, 374 A.2d 133 (1976). No part of a legislative enactment is to be treated as insignificant or unnecessary, and there is a presumption of purpose behind every sentence, clause or phrase in a statute. *Winchester* v. *Connecticut State Board of Labor Relations,* 175 Conn. 349, 355–56, 402 A.2d 332 (1978). Insofar as it is possible, the entire enactment is to be harmonized, each part made operative. *State* v. *Grant,* 176 Conn. 17, 20, 404 A.2d 873 (1978).

Applying these principles of statutory construction to the enactment of Public Acts 1983, No. 83-534, I reach the conclusion that in the absence of blood alcohol evidence, operation of a motor vehicle while impaired by liquor, in violation of General Statutes (Rev. to 1985) § 14-227a (b), is a lesser included offense of operation under the influence, in violation of § 14-227a (a).

Substitute House Bill No. 6420 was reported favorably by the judiciary committee for adoption by the legislature. Its purpose was defined in its title, "An Act Concerning the Penalties for Drunk Driving." House Bill No. 6420, upon its introduction, contained no pro-

vision for driving while impaired when it was originally referred to the judiciary committee. That section was first inserted by the committee in the substitute bill that it reported favorably for passage.

The substitute bill originally restructured the offense of "drunk driving" into four degrees, carrying proportionate penalties, and varying numerically with a person's decreasing blood alcohol percentage in this sequence: first degree—.2 percent or more; second degree—.15 percent or more, but less than .2 percent; third degree—.1 percent or more, but less than .15 percent. The "fourth degree," however, was not so called. Because it classified an offense relating to a blood alcohol percentage of under .1 percent, which is generally considered to be the blood alcohol level needed for the offense of driving under the influence of liquor, the "fourth offense or degree of drunk driving" was designated as "operating a motor vehicle while impaired." This offense was to apply when the blood alcohol ratio fell between .05 percent or more, but less than .1 percent *"and additional competent evidence is presented indicating that at the time of the alleged offense the ability of such person to operate the motor vehicle was impaired by the consumption of intoxicating liquor."* (Emphasis added.) The new offense was a misdemeanor carrying a maximum fine of five hundred dollars.

As initially proposed by the judiciary committee, conviction for operation while impaired required the stated amount of blood alcohol *plus* other evidence of impaired driving. House amendment schedule "A" eliminated the three degrees of operation under the influence of liquor and redefined the new offense of driving while impaired by removing the second requirement of "additional competent evidence" of impaired driving.

Section 1 (a) reverted to the then existing offense of operation of a motor vehicle "while under the influence

of intoxicating liquor or any drug or both." The offense continued not to be further defined. Subsection (b) provided that no person shall operate a motor vehicle "while his ability to operate such motor vehicle is impaired by the consumption of intoxicating liquor." Such "impaired driving," like "driving under the influence," was not defined, except that a "per se" violation was contained in the provision that "[a] person shall be deemed impaired when at the time of the alleged offense the ratio of alcohol in the blood of such person was more than seven-hundredths of one per cent of alcohol, by weight, but less than ten-hundredths of one per cent of alcohol, by weight."

I disagree with the majority opinion in its conclusion that this "per se" standard is the only manner in which the offense may be committed. The specified prohibition was against driving while one's ability to operate was impaired by the consumption of intoxicating liquor, and not just against driving with a blood alcohol percentage above .07 and below .1 percent, which is merely one manner of violating the statute, now made an infraction. That was the thrust of the legislation. That was the intent of the legislature.

Other provisions of amendment schedule "A" written into Public Acts 1983, No. 83-534, confirm my conclusion of error below. Evidence of a blood alcohol test was admissible under certain conditions as follows: (1) a reading above .05, but less than .1, percent could be considered with other evidence in determining operation under the influence of liquor; (2) a reading above .07, but less than .1, percent "shall constitute impairment within the meaning of this section"; (3) a ratio of .1 percent or more of alcohol "shall be prima facie evidence that the defendant was under the influence of intoxicating liquor within the meaning of this section."

Section 2 of schedule "A" amended the implied consent to blood test law. General Statutes (Rev. to 1985) § 14-227b. It now applied to an arrest for driving while impaired by the consumption of liquor. In the event of a test refusal, the police officer was required to make a sworn report setting forth "the grounds for the officer's belief that there was *probable cause to arrest* such person for operating a motor vehicle . . . *while his ability to operate such motor vehicle is impaired by the consumption of intoxicating liquor . . . ."* (Emphasis added.) The administrative hearing thereafter, relative to the suspension of a license for such test refusal, required a determination, inter alia, of whether "the police officer [had] probable cause to arrest the person for operating a motor vehicle . . . while his ability to operate such motor vehicle [was] impaired by the consumption of intoxicating liquor." Upon a subsequent refusal of blood alcohol test, a similar report and administrative inquiry were required. Such a sworn report and administrative finding of probable cause for arrest in the event of a blood alcohol test refusal must of necessity relate to an arrest for operation while impaired based upon facts other than the proscribed blood alcohol percentages. Of similar import and conclusion is the provision adopted by house amendment schedule "D," providing that in the event of prosecution for a violation of operation under the influence of liquor or operation while impaired, *evidence of a blood alcohol test refusal was admissible.*

The only logical conclusion to be drawn from this legislative history is that a violation of the impaired driving statute, while provable per se by an operator's blood alcohol ratio of more than .07, but less than .1, percent, *may* be established by other competent evidence in the same manner as a violation of operation under the influence of intoxicating liquor may be proven without a blood alcohol report. The interrelationship

of the various amendments adopted by the legislature and incorporated into the final bill show a harmony of purpose and design to extend the scope of "drunk driving" offenses, but to a lesser degree of proof and punishment, to driving while one's ability to operate a motor vehicle is impaired by the consumption of intoxicating liquor, whether provable by a blood alcohol test or by other competent evidence.

The operation of a motor vehicle while under the influence of intoxicating liquor within the prohibition of General Statutes § 14-227a (a) "has been construed to require 'that a driver had become so affected in his mental, physical or nervous processes that he lacked to an appreciable degree the ability to function properly in relation to the operation of his vehicle.' *Infeld* v. *Sullivan,* 151 Conn. 506, 509, 199 A.2d 693 [1964]." *Higgins* v. *Champ,* 161 Conn. 200, 203, 286 A.2d 313 (1971); see *State* v. *Hancich,* 200 Conn. 615, 622, 513 A.2d 638 (1986). Driving while one's ability to operate is impaired by the consumption of intoxicating liquor has not been defined, *except* for the statutory per se violation by a blood alcohol ratio of more than .07, but less than .1, percent of alcohol, by weight. *State* v. *Hancich,* supra, 620. Our courts have not had occasion before this case to define the full meaning of driving while one's ability to operate is impaired by the consumption of intoxicating liquor.

Section 14-227a (b) prohibiting the operation of a motor vehicle while impaired by the consumption of intoxicating liquor is a unique law. A related statute, however, is found in Michigan Statutes Annotated § 9.2325 (2), which provides: A person shall not "operate a vehicle . . . when, due to consumption of intoxicating liquor . . . he has visibly impaired his ability to operate the vehicle. Where a person is charged with [driving while under the influence of intoxicating

liquor], a finding of guilty shall be permissible under this section." The Michigan Supreme Court has approved the following charge to express the legislative intent necessary for a conviction under its impaired driving law: " 'The distinction between the crime of driving under the influence of intoxicating liquor and the lesser included offense of driving while ability is visibly impaired is the degree of intoxication which the people must prove. To prove driving under the influence of intoxicating liquor, the people must prove that defendant's ability to drive was substantially and materially affected by consumption of intoxicating liquor. To prove driving while ability is visibly impaired, the people must prove that defendant's ability to drive was so weakened or reduced by consumption of intoxicating liquor that defendant drove with less ability than would an ordinary, careful and prudent driver. Such weakening or reduction of ability to drive must be visible to an ordinary, observant person.' " *People* v. *Lambert,* 395 Mich. 296, 305, 235 N.W.2d 338 (1975).

For the above reasons, I would find that in the absence of blood alcohol evidence, the operation of a motor vehicle by a person while his ability to operate such motor vehicle is impaired by the consumption of intoxicating liquor, in violation of General Statutes (Rev. to 1985) § 14-227a (b), is a lesser included offense of operation under the influence of liquor, in violation of General Statutes (Rev. to 1985) § 14-227a (a).

Accordingly, I would find error.