[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
INTRODUCTION
The two captioned matters are appeals from decisions of the Department of Utility Control ("DPUC"). Because they have the same parties and turn on the same issues, the have been consolidated for argument and decision, and the decision applies to both.
Each of the six plaintiff-appellants (one of whom was joined as a plaintiff-appellant after the filing of these appeals) is a CT Page 7186 cellular mobile telecommunications provider ("cellular provider") which is licensed to provide cellular telephone services by the Federal Communications Commission ("FCC") (the plaintiff-appellants are hereinafter referred to, collectively, as "Metro Mobile"). Pursuant to the Omnibus Budget Reconciliation Act of 1993, Pub.L. 103-66 § 6002, 107 Stat. 394 (1993) (the "Budget Act"), Congress has preempted the DPUC from exercising licensing or rate-making authority relative to the provision of cellular telephone services by cellular providers. The DPUC has not challenged the authority of Congress, under the supremacy clause of the United States Constitution (Article VI), to preempt those aspects of state regulation of cellular telephone service.
In 1994, the General Assembly adopted P.A. 94-83 which, in its amendments to § 16-247e, C.G.S.:
 1) Permits the DPUC, if necessary, to "establish a universal service program, funded by all telecommunications companies or users in the state on an equitable basis, as determined by the department, to ensure the universal avail! ability of affordable, high quality basic telecommunication services to all residents and businesses throughout the state regardless of location" (the "Universal Service Program"); and,
 2) Requires the DPUC to "establish a lifeline program funded by all telecommunications companies on an equitable basis, as determined by the department, sufficient to provide low-income households or individuals with a level of communications service or package of telecommunications services that supports participation in the economy and society of the state" (the "Lifeline Program").
Pursuant to the authority granted to it by P.A. 94-83 to establish a Universal Service Program, the DPUC, by its March 31, 1995 decision in its Docket No. 94-07-08 (the "Universal Decision"), determined that cellular providers will be required to make payments toward the funding of a Universal Service Program. Also pursuant to the authority granted to it inP.A. 94-83, the DPUC, by its May 3, 1994 decision in its Docket No. 94-07-09 (the "Lifeline Decision"), determined that cellular providers will be required to make payments toward the funding of CT Page 7187 a Lifeline Program. It is from those decisions that Metro Mobile has appealed.
P.A. 94-83 was adopted against the backdrop of the Budget Act, which provides, in relevant part:
 [N]o State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services. Nothing in this subparagraph shall exempt providers of commercial mobile services (where such services are a substitute for land line telephone exchange service for substantial portion of the communications within such State) from requirements . . . to insure the universal availability of telecommunications service at affordable rates.
47 U.S.C. § 332 (c)(3)(A) (the "Preemption Clause").
Subsequent to the taking of these appeals, Congress adopted, and the President signed, the Telecommunications Act of 1996, Pub.L. 104-104, 110 Stat. 56 (the "1996 Act"), which provides, in relevant part:
 Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State.
1996 Act, § 254(f) (to be codified at 47 U.S.C. § 254[f]).
The 1996 Act goes on to provide: "A State may adopt regulations not inconsistent with the (Federal Communications) Commission's rules to preserve and advance universal service . . . "1996 Act, § 254(f). The FCC has not yet CT Page 7188 adopted such rules, and therefore Connecticut has not yet adopted any such regulations.
It is found that Metro Mobile is aggrieved by each of the appealed decisions because of the financial impact each would have on it, if implemented, and it is held that Metro Mobile has standing to maintain these appeals.
ISSUES PRESENTED
These appeals present the following issues:
1) Does the Budget Act preempt Connecticut from assessing Metro Mobile for Universal Service and Lifeline Programs?
2) Are the authorities granted to the DPUC by P.A. 94-83 to assess telecommunications companies for Universal Service and Lifeline Programs on an "equitable basis" delegations of legislative authority which violate Article Second (separation of powers provision) of The Connecticut Constitution?
3) Are the assessing authorities granted to the DPUC byP.A. 94-83 unconstitutionally vague in violation of due process requirements? and,
4) What effect, if any, does the 1996 Act have on the decisions appealed from?
PREEMPTION
The DPUC acknowledges that the Budget Act preempts it from licensing, and from regulating the rates of, cellular providers. However, the DPUC contends that its assessments on cellular providers for the Universal Service and Lifeline Programs have been exempted from preemption by the following portion of the Preemption Clause: ". . . except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services."
Thus the preemption issue turns on whether assessments on cellular providers for Universal Service and Lifeline Programs are "other forms and conditions of commercial mobile services."
In support of its argument that these assessments are "other terms and conditions" of service, the DPUC cites the legislative CT Page 7189 history of the Budget Act, in particular the House Report, which states:
 It is the intent of the Committee that the states still would be able to regulate the terms and conditions of these services. By "terms and conditions," the Committee intends to include such matters as customer billing information and practices and billing disputes and other consumer protection matters; facilities siting issues (e.g., zoning); transfers of control; the bundling of services and equipment; and the requirement that carriers make capacity available on a wholesale basis or other such matters as fall within a state's lawful authority. This list is intended to be illustrative only and not meant to preclude other matters generally understood to fall under "terms and conditions."
H.R. No. 103-111, 103d Cong., 1st Sess. at 261, reprinted in 1993 U.S. Code Cong. Admin. News at 588.
Under the rules of statutory construction, legislative history may be reviewed to resolve an ambiguity in a statute, but it may not be relied on to create an ambiguity which is not apparent on the face of a statute. Therefore, the question is whether the Preemption Clause is facially ambiguous as to the authority of the states to assess cellular providers for programs such as the Universal Service and Lifeline Programs.
While the DPUC claims an ambiguity exists in that portion of the Preemption Clause which states:
 . . . this paragraph shall not prohibit a state from regulating the other terms and conditions of commercial mobile services . . .,
the court finds the following portion of the same sub-paragraph more to the point: CT Page 7190
 Nothing in this subparagraph shall exempt providers of commercial mobile services (where such services are a substitute for land line telephone exchange service for a substantial portion of the communications within such state) from requirements imposed by a state commission on all providers of telecommunications services necessary to ensure the universal availability of telecommunications service at affordable rate.
The rules of statutory construction require that no language in a statute be read to be redundant. Because the former excerpt from the Preemption Clause grants to the states the authority to regulate "other terms and conditions" of cellular service, the latter excerpt, which expressly exempts from preemption any assessments for universal and affordable service where cellular service is a significant substitute for land line service, would be redundant if such assessments were among "other terms and conditions" of cellular service and thereby already exempt.
By expressly exempting from preemption those assessments which are made on cellular providers in a state in which cellular service is a substitute for land line service, Congress left no ambiguity that cellular providers in states in which cellular is not a substitute for land line service fall under the umbrella of federal preemption. Accordingly, it is held that the Budget Act preempts the DPUC from assessing Metro Mobile for payments to the Universal Service and Lifeline Programs.
ARTICLE SECOND STANDARDS FOR DELEGATION
Article Second of the Constitution of Connecticut, as amended by Article XVIII of its Amendments, provides:
 The powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another. The legislative department may delegate regulatory authority to the executive CT Page 7191 department; except that any administrative regulation of any agency of the executive department may be disapproved by the general assembly or a committee thereof in such manner as shall by law be prescribed.
The leading Connecticut case in which a delegation of authority by the legislature to the executive branch was voided for lack of sufficient standards is State v. Stoddard, 126 Conn. 623
(1940). In Stoddard, the court found that the challenged statute did not contain sufficiently definite standards for the exercise of the delegated authority, with the result that the executive branch was exercising an essentially legislative function in violation of Article Second. Stoddard dealt with a statute which authorized the state's milk administrator "to establish, from time to time, a minimum price for the different milk areas of the state for each class and grade of milk or milk products . . ." The statute in issue contained only the following standard to guide the exercise of the delegated authority: "In establishing minimum prices for milk under the provisions of [the statute in issue], the milk administrator shall take into consideration the type of container used and other cost factors which should influence the determination of such prices." The court said that, in order to comply with the provisions of Article Second, a statute which delegates authority must establish "primary standards" for the exercise of that authority. Finding no such standards in the milk price act, the Court held it unconstitutional.
Our courts have decided a number of cases sustaining legislative delegations to the executive branch, of which the following are examples:
 Biz v. Liquor Control Commission, 133 Conn. 556 (1947), in which the court found sufficiently definite the standards in a statute which authorized the Liquor Control Commission to refuse to grant a liquor permit if the commission:
 has reasonable cause to believe . . . that the number of permit premises in the locality is such that the granting of a permit is detrimental to public interest, and, in reaching a conclusion in this CT Page 7192 respect, the commission may consider the character of, the population of, the number of like permits and number of all permits existent in, the particular town and the immediate neighborhood concerned, the effect which a new permit may have on such town or neighborhood or on like permits existent in such town or neighborhood . . .;
Id., 721; and,
Roan v. Conn. Industrial Building Comm. 150 Conn. 333 (1963), in which the court found sufficiently definite, for constitutional purposes, the standards governing the making of mortgage loans by a commission of the executive branch to private sector borrowers, which the court paraphrased as follows:
 The commission . . . has . . . to decide that the mortgage (1) is one made and held by an approved mortgagee, responsible and able to service the mortgage properly; (2) involves a principal obligation not in excess of $5,000,000 for any one project and not exceeding 90 percent of the cost of the project; (3) has a maturity within three-quarters of the remaining useful life of the property but not more than twenty! five years; (4) contains complete amortization provisions requiring periodic payments within the ability of the mortgagor to pay; and (5) contains essential provisions as to property insurance, repairs, taxes, default and similar matters.
Id., 344; and,
University of Connecticut Chapter, AAUP v. Governor,200 Conn. 386 (1986), in which the court upheld a statute authorizing the governor to reduce budgetary allotments, in the court's words:
if (1) due to a change in circumstances CT Page 7193 since the budget was adopted certain reductions should be made in various allotments of appropriations, or (2) the estimated budget resources during such fiscal year will be insufficient to pay all appropriations in full . . .
Id., 398.
The Connecticut case which, on its facts, is closest to these appeals is Kellems v. Brown, 163 Conn. 478 (1972), which concerned a statute creating a tax on dividend income and authorizing the tax commissioner to adopt regulations for the operation and enforcement of that tax. The authority of the commissioner to adopt regulations was challenged on Article Second grounds, and the court noted that:
 The power granted to an administrative board or official may include, but is not limited to, the establishment of filing requirements, the hearing of administrative appeals, the finding of facts, and the determination of when as opposed to how a tax may be imposed.
Id., 499.
In Kellems the court went on to describe the separate legislative and administrative functions under the statute at issue, as follows:
 The General Assembly specifically levied the tax, the rate prescribed and defined the income subject to taxation as well as the persons who are required to pay. 12-505, 12-506. It then authorized the tax commissioner to (1) prescribe the information required of the taxpayer, (2) to design forms for returns, (3) to require the submission of copies of federal income tax returns and supporting records, (4) to extend time limitations, and (5) to promulgate regulations for enforcement of the act and collection of the prescribed tax.
Id., 500. CT Page 7194
In holding the above-described statutory standards sufficiently definite, the Kellems court observed that:
 As long as revenue legislation sets out with specificity the rate of the tax, the instances where it is to be imposed and those who will be liable to pay it, there is no impermissible delegation of legislative power merely because the details of regulation and enforcement are left to administrative action.
Id., 501.
While Kellems concerned a tax statute, the analysis employed by the Kellems court is the same as that which appears in the other decisions cited above. Accordingly, the court concludes that Kellems is another in the line of well-established Article Second delegation cases, and that Kellems is not a separate genre of tax case which deals, incidentally, with delegation issues. Therefore, it is not necessary for the court to decide whether, in a technical sense, assessments for the Universal Service and Lifeline Programs would constitute taxes in order to determine whether the Kellems analysis applies to these appeals.
The view that it does not matter, for Article Second purposes, whether payments made pursuant to P.A. 94-83 are denominated taxes or assessments is confirmed by an analysis of the elements of those types of imposition. Each involves a taking by government of money from a party in order to fund expenditures which have a presumed public purpose. (Since the constitutionality of the disbursement by the DPUC, outside of the legislative appropriation process, of monies raised by its assessments has not been raised in these appeals, and since a determination of the constitutionality of those disbursements is not necessary to a decision in these appeals, that issue is not addressed here.) In a constitutional sense, it makes no difference whether the authority for such a taking is characterized as a tax, an assessment or otherwise, because the consequence is the same; a lighter purse. One has a right to know that such a fiscal invasion is authorized by a constitutionally sufficient legislative directive. Accordingly, the standards laid out in Kellems apply to the delegation provisions ofP.A. 94-83.
The authority for the DPUC, under P.A. 94-83, to establish CT Page 7195 and fund the Universal Service Program is as follows:
 The [DPUC] may, if necessary, establish a universal service program, funded by all telecommunications companies or users in the state on an equitable basis, as determined by the [DPUC] . . .
§ 16-247e(b), C.G.S.
The authority for the DPUC, under P.A. 94-83, to establish and fund the Lifeline Program is as follows:
 . . . The [DPUC] shall . . . establish a lifeline program funded by all telecommunications companies on an equitable basis, as determined by the [DPUC]
§ 16-247e(a), C.G.S.
The narrow issue before the court is whether the language "on an equitable basis, as determined by the [DPUC]," as used in the legislative delegation of authority to the DPUC to fund the Universal Service and the Lifeline Programs, "sets out with specificity the rate of the [assessment], the instances where it is to be imposed and those who will be liable to pay it . . .", as required by Kellems. Id., 501.
The determination of what is "equitable" is subjective, and therefore one person may find equitable what another finds distinctly inequitable. Because "equitable" is subject to many interpretations, it is the DPUC, in determining what is equitable, which "sets out with specificity the rate of the [assessment]," which determines "the instances where it is to be imposed" and which determines "those who will be liable to pay it." Because, according to Kellems, those determinations can only be made by the legislature, the grant of funding authority to the DPUC in P.A. 94-83 does not pass Kellems muster. Further, the single word "equitable" does not meet the criteria for primary standards developed by Stoddard, Biz and Roan. Accordingly, the funding mechanisms established by P.A. 94-83 violate Article Second.
The grant of authority to the DPUC, in P.A. 94-83, to establish the Universal Service Program "if necessary" raises a similar Article Second issue. However, that issue has not been CT Page 7196 raised by the parties, and its determination is not necessary to a decision in these appeals. Accordingly, that issue is not addressed here.
VOID FOR VAGUENESS DUE PROCESS STANDARDS
In State Mgmt. Assn. of Connecticut, Inc. v. O'Neill,204 Conn. 746 (1987), a statute was challenged on due process vagueness grounds. The Court upheld the challenged statute and noted:
 Courts have derived the void for vagueness doctrine from the constitutional guarantee of due process. Civil statutes must be definite in their meaning and application, but may survive a vagueness challenge by a lesser degree of specificity than in criminal statutes. Due process of law requires that statutes must be sufficiently definite and precise to enable a person to know what conduct is permitted and what is prohibited. An imprecise statute, however, may be sufficiently definite if it provides reasonably distinct boundaries for its fair administration.
Id., 757-58. (Citations and quotation marks omitted.)
In Bottone v. Westport, 209 Conn. 652 (1989), the court, after citing State Management Assn., refined the due process standard to be applied to void for vagueness challenges, as follows:
 Specifically, the standard is whether the statute afford[s] a person of ordinary intelligence a reasonable opportunity to know what is permitted or prohibited.
Id., 667. (Citations and quotation marks omitted.)
Void for vagueness challenges on due process grounds are raised most frequently against criminal statutes, and therefore the test of whether a statute allows one to discern what is permitted or prohibited is framed for analysis of a criminal statute. However, the concept underpinning the standard, that is, whether a statute is drafted with the clarity or specificity needed to allow one to know to what it applies, can be applied as CT Page 7197 readily to challenges to legislative delegations as it can to legislative declarations of forbidden behavior.
Applying this due process test to P.A. 94-83, the question is whether the language "on an equitable basis, as determined by the [DPUC]" affords a person of ordinary intelligence a reasonable opportunity to know against whom assessments for the Universal Service and Lifeline Programs can be levied, and in what amounts. Those questions are answered in the negative, and it is held that the funding mechanisms for the Universal Service and Lifeline Programs contained in P.A. 94-83 are void for vagueness under the due process clause of the Connecticut Constitution, Article First, Section 8, as amended by Article XVII of its Amendments.
EFFECT OF THE 1996 ACT
As noted above, the 1996 Act provides: "A state may adopt regulations not inconsistent with the [FCC's] rules to preserve and advance universal service." As the parties stipulated at argument, the FCC has not yet adopted any such rules, and Connecticut has not adopted any such regulations. Accordingly, neither the 1996 Act, nor anything done by Connecticut pursuant to it, negates the Budget Act's preemption of Connecticut's ability to assess Metro Mobile for the Universal Service and Lifeline Programs.
CONCLUSION
It is held that:
 1) Substantial rights of Metro Mobile have been prejudiced by the DPUC decisions appealed from;
 2) The DPUC's declared intent to assess Metro Mobile for the Universal Service and Lifeline Programs violates the Budget Act; and,
 3) The funding mechanisms for the Universal Service and Lifeline Programs contained in P.A. 94-83, on which the decisions appealed from are based, violate Article Second and the due process clause of The Connecticut Constitution.
These appeals are sustained. CT Page 7198
George Levine, Judge